Pages 1 - 88

United States District Court

Northern District Of California

Before The Honorable William Alsup

United States of America,   )
                            )
            Plaintiff,      )
                            )
  vs.                       )          NO. CR 08-730
                            )
Guillermo Herrera,          )
                            )
            Defendant.      )
_____)

San Francisco, California
Wednesday, September 23, 2009

**Reporter's Transcript of Proceedings**

**Appearances:**

For Plaintiff:          Joseph P. Russoniello, Esquire
                        United States Attorney
                        450 Golden Gate Avenue, Box 36055
                        San Francisco, California  94102
                  By:   **Wilson Leung, Esquire**
                        Assistant United States Attorney


For Defendant:          Law Office of Martin Sabelli
                        50 Liberty Street
                        San Francisco, California  94114
                  By:   **Martin Sabelli, Esquire**


(Appearances continued on next page.)



*Reported By:*          *Sahar McVickar, RPR, CSR 12963*
                        *Official Reporter, U.S. District Court*
                        *for the Northern District of California*

(Computerized Transcription by Eclipse)

**Appearances, (continued):**

```
For Defendant:          Law Office of Peter Goodman
                        400 Montgomery Street, 2nd Floor
                        San Francisco, California  94104
                   By:  Peter Goodman, Esquire

For San Francisco
Police Department:      San Francisco Police Department
                        850 Bryant Street, Room 575
                        San Francisco, California  94103
                   By:  Ronnie Wagner, Esquire

Also Present:           Carol Rhine-Medina
                        Certified Interpreter

                        Carol Tonelli
                        Certified Interpreter
```

**---o0o---**

# I N D E X

                                                                    **Page**

**Plaintiff's Witnesses:**

None


**Defendant's Witnesses:**

**Molina, Mario
(Sworn)**

Direct Examination by Mr. Sabelli                                    11
Cross-Examination by Ms. Wagner                                      53

**Ferrando, Ernest
(Sworn)**

Direct Examination by Ms. Martin                                     58


---o0o---


# E X H I B I T S


| **Plaintiff's Exhibits:** | **W/Drawn** | **Iden.** | **Evid.** |
|---|---|---|---|
| None | | | |

| **Defendant's Exhibits:** | **W/Drawn** | **Iden.** | **Evid.** |
|---|---|---|---|
| None | | | |


---o0o---

4

```
 1   Wednesday, September 23, 2009                    1:00 P.M.

 2                     P R O C E E D I N G S

 3            MR. SABELLI:  Good afternoon, Your Honor.

 4            THE COURT:  All right, have a seat.

 5            THE CLERK:  Calling criminal No. CR08-730, it's

 6   United States versus Guillermo Herrera.

 7            MR. GOODMAN:  Good afternoon, Your Honor.

 8            Peter Goodman appearing for Erick Lopez.

 9            My client's case is not on calendar this afternoon,

10   and I'm somewhat of an interloper in this, but I want to get

11   the Court's input very briefly about the materials that were

12   turned over on Thursday regarding the Henthorne review.

13            I had a problem with some of those materials and

14   also with the -- understanding the Court's review process.  And

15   my request, and I talked to Ms. Wagner about this, would be for

16   me to be able to submit in the next two weeks a request for

17   guidance, written by me, as to what filters the Court is using

18   in reviewing the Henthorne material, and also whether I may be

19   entitled to some additional discovery for some materials that

20   were redacted from the materials we got.

21            And my idea was for me to submit something in two

22   weeks, her to have a response to that the following week, and

23   then the Court issue an order as to the process that is being

24   used to review those materials and whether --

25            THE COURT:  Whatever comes in here, I err on the
```

1   side of giving you anything that's a close call.

2          MR. GOODMAN:   There is some --

3          THE COURT:   If it looks like the cops lied, or

4   whatever, you get that.   But I -- you know, these are usually

5   dry holes for the defense lawyers, there is nothing there.

6          MR. GOODMAN:   There is one document that you turned

7   over specifically regarding Sergeant Molina in which there are

8   portions that are redacted, and those portions I think may

9   involve statements that he gave to the Management Control

10  Division.   I believe that we have a right to his statements in

11  that way, and that's one thing I wanted to address.

12         THE COURT:   Not if it didn't have anything to do

13  with this case.

14         MR. GOODMAN:   It had to do --

15         THE COURT:   Why would you have a right to all of

16  that unless it has something to do with this case or could be

17  used for impeachment?

18         MR. GOODMAN:   That's exactly right, it has something

19  to do with impeachment.

20         THE COURT:   You file your motion, and we'll look at

21  it again.

22         MR. GOODMAN:   Great.   I will do that in the next

23  couple weeks.   And I just wanted to bring this to the attention

24  of the Court.   That was my only input today.

25         THE COURT:   Don't ask for continuances of the

```
 1   trial --
 2              MR. GOODMAN:  I'm not asking for any continuances.
 3              THE COURT:  -- based on this.  So if you want to do
 4   it sooner, I'll rule sooner.  If you want to take two weeks,
 5   that's fine, too.
 6              MR. GOODMAN:  Okay.  Thanks, very much.
 7              THE COURT:  Okay, Mr. Sabelli, you need to make your
 8   appearance.
 9              MR. SABELLI:  Good afternoon, Your Honor.
10              Martin Sabelli for Mr. Herrera, who is present.  He
11   is unfortunately not being assisted by a Spanish language
12   interpreter because the machine isn't working.  He just
13   indicated that he cannot hear.  He is, however, present, Your
14   Honor.
15              THE COURT:  Well, let's make sure he can understand
16   what's happening.  So we'll take a moment to get the machine
17   working.
18              MR. SABELLI:  Your Honor, I'll explain to him the
19   nature of the proceeding that Mr. Goodman and the Court just
20   engaged in.  I think that I can report that to him.  I don't
21   think it's necessary that we go back on the record on that.
22              THE COURT:  Okay.  Thank you.
23              THE INTERPRETER:  May the interpreter try with the
24   other half of the equipment?
25              THE COURT:  We only got one person here, why don't
```

1    you just sit by him and interpret?  We don't need a fancy

2    machine.

3              *THE INTERPRETER:*  Right.

4              *THE COURT:*  You know, it's just one more example on

5    the wasted Government money on equipment that doesn't work.  So

6    we'll just do it the old-fashioned way.

7              All right, Mr. Sabelli, your appearance.

8              *MR. SABELLI:*  Thank you very much, Your Honor.

9              Martin Sabelli for Mr. Herrera, who is present, Your

10   Honor.  He is being assisted by the Spanish language

11   interpreter.

12             *THE COURT:*  Who is sitting right next to him, and

13   it's working fine.

14             *MR. SABELLI:*  Apparently so, Your Honor, I would

15   agree with that.

16             *THE COURT:*  All right.

17             Mr. Sabelli, we got two witnesses today?

18             *MR. SABELLI:*  We do, Your Honor.

19             *THE COURT:*  We have to bring -- look, we are going

20   to do this today.  Most judges would never have given you this

21   evidentiary hearing, I'm giving it to you, but it is going to

22   come to an end.  We are going to bring in -- I got to get this

23   case moving.  We have been delaying.  It's time to bring the

24   evidentiary hearing to an end.  We are going to have your

25   witnesses, you are going to get a good shot at them today, but

```
 1   we got to be crisp and get to the point.

 2            MR. SABELLI:  I understand, Your Honor.  We will

 3   certainly respect that hearing.

 4            As the Court knows, this is the first evidentiary

 5   hearing with respect to our subpoena.

 6            THE COURT:  Well, you got into a lot of this before

 7   in your other thing about the A files and the filing cabinet,

 8   and all that, and I thought that was useful.  I'm not saying it

 9   wasn't useful, but you have a very long subpoena.

10            I'm going to let you make your evidentiary record,

11   then we are going to have a round of briefing on the subpoena.

12   Some of these items are way beyond the pale.  And then we are

13   going to rule, and it's going to be over.  And they are going

14   to produce whatever they are going to produce.

15            So I'm allowing you to call the officers in support

16   of laying the evidentiary foundation.  It may be these are --

17   some of these may be more reasonable than they seem, some of

18   them are very reasonable, but we've got to -- we got to --

19   today is the day.

20            So who is our first officer?

21            MR. SABELLI:  Your Honor, the defense calls

22   Sergeant Molina, who is in the courtroom, please.

23            THE COURT:  Great, Sergeant Molina.

24            MR. SABELLI:  And, Your Honor, keeping with our

25   policy, I would ask that Lieutenant Ferrando please step in the
```

```
 1   hallway.  He is going to be the next witness.

 2              Thank you.

 3              THE COURT:  Is it sergeant?  I forgot.

 4              THE WITNESS:  Sergeant.

 5              THE COURT:  All right.  Welcome.  And please raise

 6   your right hand.

 7                        MARIO MOLINA,

 8   called as a witness for the defendant, having been duly sworn,

 9   was examined and testified as follows:

10              THE CLERK:  Please state your full name for the

11   record.

12              THE WITNESS:  Mario Molina.

13              THE COURT:  All right, welcome.

14              Have you testified in this case already?

15              THE WITNESS:  I have, Your Honor.

16              THE COURT:  What was that about?

17              THE WITNESS:  Evidentiary hearing.

18              THE COURT:  Another hearing?

19              THE WITNESS:  Yeah.

20              THE COURT:  What was that about?

21              MR. SABELLI:  Your Honor, he testified as the second

22   defense witness in the Brady hearing.  Mr. Rosenbush examined

23   him on August 4th.

24              THE COURT:  I remember that now.  Okay.

25              Welcome back, then.  We are here for a different
```

```
1    reason today to figure out what -- where the documents that

2    have been requested by Mr. Sabelli might exist and if they do

3    exist.  And so he is going to ask you some questions about

4    that.

5              Ms. Wagner, if you want to ask questions afterwards,

6    you will be entitled to.  Why don't you come up here and sit at

7    counsel table.

8              MS. WAGNER:  Thank you, Judge.

9              THE COURT:  I don't see anyone from the United

10   States Attorney's Office; did they know about this hearing?

11             MS. WAGNER:  I'm surprised not to see the assistant

12   U.S. Attorney here, Your Honor.

13             THE COURT:  This is a problem.

14             Dawn, have we called to see if they are ready, if

15   they are going to come?

16             THE CLERK:  I don't know if he is coming.  I have

17   not been in touch with him.

18             THE COURT:  Who is it?

19             MR. SABELLI:  Your Honor, I can say that Mr. Leung

20   has in the past expressed an interest in being at this hearing.

21   And I've communicated with him about this hearing.

22             THE COURT:  All right, we will take a five-minute

23   break while we try to track him down and find out why he is not

24   here.

25             I'm sorry, Sergeant.  Bear with us.  We'll take a
```

1  five-minute break.

2              *THE WITNESS:*  Can I step down?

3              *THE COURT:*  You can go wherever you want.

4                      **(Brief recess taken at 1:20 p.m.)**

5                      **(Proceedings resumed at 1:27 p.m.)**

6              *THE COURT:*  Are we ready to go?

7              *MR. SABELLI:*  Yes, Your Honor.

8              *THE COURT:*  Mr. Leung, you weren't here earlier.

9              *MR. LEUNG:*  My apologies, Your Honor.  I'm here only

10 as an observer.  We are not a party to this particular

11 controversy.

12             I would also note for the record that my appearance

13 does not concede in any way the sort of Brady relationship.

14             *THE COURT:*  I understand that.  That is a fair point

15 to make.

16             You know, if you want to leave, you can.

17             *MR. LEUNG:*  I would like to observe the proceedings,

18 if I could, from the safety of the back, if the Court would

19 allow me to do that.

20                      **(Laughter.)**

21             *THE COURT:*  No, you are a member of the Bar, you sit

22 right here.  We will take your comment at face value.  All

23 right.

24             *MR. LEUNG:*  Thank you.

25             *THE COURT:*  Ms. Wagner, you are free to make

**Molina - Direct / Sabelli**

```
 1   objections, or whatever, as the case goes along.  So just do
 2   what you want.
 3              All right, now, was the witness sworn?
 4              THE CLERK:  Yes, Your Honor.
 5              THE COURT:  Okay.
 6              Sergeant Molina, again, welcome back.
 7              THE WITNESS:  Thank you.
 8              THE COURT:  Mr. Sabelli, you may ask questions.
 9              MR. SABELLI:  Thank you very much, Your Honor.
10                        DIRECT EXAMINATION
11   BY MR. SABELLI:
12   Q.  Sergeant Molina, you understand the purpose of today's
13   hearing; is that right?
14   A.  What do you mean?  I have no idea what you are going to ask
15   me.
16   Q.  Have you spoken to Ms. Wagner while you were here?
17   A.  I did.
18   Q.  And did you understand why the judge -- the explanation the
19   judge gave about why you are here today?
20   A.  I heard what he said, but it's still not clear to me why
21   I'm here.
22   Q.  Okay.
23              I'm going to ask you about how you and the Gang Task
24   Force and the San Francisco Police Department maintain
25   information, collect information, how you file it, and when and
```

**Molina - Direct / Sabelli**

1   how if you ever purge it, okay?

2   *A.*   Okay.

3   *Q.*   And I would ask you to make distinctions between the Gang

4   Task Force and other entities within the San Francisco Police

5   Department, if that's relevant to an answer.

6   *A.*   Okay.

7   *Q.*   Does that make sense to you?

8   *A.*   Yes.

9   *Q.*   Okay.

10          Now, you are currently within the Gang Task Force?

11  *A.*   No.

12  *Q.*   What period of time were you within the Gang Task Force?

13  *A.*   I would say from the latter part of 2003 to August of last

14  year.

15  *Q.*   August of 2000 --

16  *A.*   2008.

17  *Q.*   So I'm going to ask you about that period, that period

18  during which you were part of the Gang Task Force.

19  *A.*   Okay.

20  *Q.*   Okay?

21          Now, when you were part of the Gang Task Force, you

22  had a specific specialty within the Gang Task Force; is that

23  fair to say?

24  *A.*   I did.

25  *Q.*   And that would be Latino gangs?

**Molina - Direct / Sabelli**

1   **A.**   Yes.

2   **Q.**   Would you be more of a specialist in Norteño gangs or

3   Sureño gangs?

4   **A.**   All of them.

5   **Q.**   All Latino gangs?

6   **A.**   Yes.

7   **Q.**   One of the gangs that you specialized in that you focused

8   on in your work was MS13?

9   **A.**   I focused on all of them.

10  **Q.**   Okay, but MS13 was one of the gangs that you worked on?

11  **A.**   Yes.

12  **Q.**   All right.  And specifically, MS13 click that operated in

13  the Mission District of San Francisco?

14  **A.**   That's correct.

15  **Q.**   Okay.

16          All right, now, and you speak fluent Spanish; is

17  that right?

18  **A.**   Yes.

19  **Q.**   Fully fluent?  Fairly fluent?

20  **A.**   My first language.

21  **Q.**   It's your first language, okay.

22          The first set of questions I want to ask you about

23  have to do with whether or not there are any formal or official

24  protocols within the Gang Task Force for maintaining

25  gang-related information.  Do you know of any?

**Molina - Direct / Sabelli**

1  *A.*  What do you mean?

2  *Q.*  For example, is there a written directive that -- that

3  instructs members of the Gang Task Force how information is to

4  be maintained within the Gang Task Force?

5         *THE COURT:*  You are using the present tense, and I

6  thought you were going to ask him about '03 to '08.

7         *MR. SABELLI:*  Your Honor, yes, I am asking about

8  that period.  And I thought I had clarified that.

9         *THE COURT:*  No, but it might not be clear -- so

10  somebody else will get ahold of this transcript and say it

11  exists right now.

12         *MR. SABELLI:*  Sure, I'll clarify.

13         *THE COURT:*  Try to use the right verb tense.

14         *MR. SABELLI:*  Sure.  I'll clarify.

15  *BY MR. SABELLI:*

16  *Q.*  So you understand, I'm asking about the period that you

17  were within the Gang Task Force.  So I'll ask my question

18  again.

19  *A.*  Okay.

20  *Q.*  During the period of time that you were within the Gang

21  Task Force, were you aware of any protocols that instructed

22  members of the Gang Task Force as to how they would collect,

23  receive, maintain, or file information within the Gang Task

24  Force?

25  *A.*  Umm, I know there was a unit order on investigating process

**Molina - Direct / Sabelli**

1    of it, but I'm not sure whether there was anything about

2    maintaining files.

3    *Q.*   I couldn't make out what you said.

4          There was a unit order?

5    *A.*   Order on how to do investigations, for the investigation

6    part of it.  But I'm not sure there was a specific order on how

7    to maintain files.

8    *Q.*   And that unit order that you were referring to, was that

9    the Gang Task Force unit order or an SFPD general unit order?

10   *A.*   It was our Gang Task Force unit order.

11   *Q.*   So it was within the Gang Task Force?

12   *A.*   I think it was, yes.

13   *Q.*   And do you know who issued that order?

14   *A.*   The department.

15   *Q.*   Do you know the date of that order?

16   *A.*   *(Shaking head.)*

17   *Q.*   Do you maintain a copy of that order anywhere?

18   *A.*   Me?  No.

19   *Q.*   Do you know where I would find a copy of that order?

20   *A.*   Yeah, San Francisco Police Department Gang Task Force.

21   *Q.*   So you believe that while you were there a copy of that

22   order was maintained with the Gang Task Force?

23   *A.*   There is a unit order that tells you how to do follow-up

24   investigations, yes.

25   *Q.*   Okay.  And that order, that unit order, does that tell Gang

**Molina - Direct / Sabelli**

1    Task Force officers how to file information and maintain those

2    files?

3    **A.**  Umm, I don't remember specifically whether it tells you how

4    to maintain files, but I know it tells you how to handle your

5    cases, what you need to do, how to respond to crime scenes,

6    when you need to respond and when you don't need to respond,

7    who to notify, and so forth.

8    **Q.**  Okay, let me come at it from a different angle.

9          What I want to know is this:  During the period that

10   you were within the Gang Task Force, how did you understand

11   what your responsibilities were in terms of receiving

12   information, collecting information, and maintaining

13   information?  How did you come to -- what was your

14   understanding of how you did that, and where was that

15   understanding coming from?

16   **A.**  From the people that trained me when I got there.  There

17   was senior inspectors and sergeants that were there when I got

18   there in 2003.  And we did FI cards.  We did field interview

19   cards.  We filled them out and filed them.

20         There was a drawer for moniker cards, for nicknames,

21   and you had to reach for that.  There was a file for names.

22   They had a 4 by 4 card with names and possible nicknames and

23   information.

24   **Q.**  I'm inferring from your answer that you don't know of any

25   single written directive or memorandum that told you, when you

**Molina - Direct / Sabelli**

1   were part of the Gang Task Force, how you should receive,

2   collect, or maintain information.  Am I right; there were no

3   written instructions to you at the time about those issues?

4   *A.*  I don't know if there was one or not.  It's been a long

5   time, but at this point in time, I don't have a present

6   recollection.

7   *Q.*  You don't have a present recollection of whether or not

8   there were any written instructions about how you, as a Gang

9   Task Force officer, were to maintain information?

10  *A.*  Not at this time, no.  What I remember is just what I did,

11  it was that I was collecting information, filing FI cards,

12  entered that information in the computer system.  We also had

13  filed like investigating files that we keep in each case, put

14  information on that.

15  *Q.*  Investigative files that you keep in each case; is that

16  what you just said?

17          I'm sorry, your voice is trailing down, so if I

18  could ask you to speak up a little.

19  *A.*  Yes.

20  *Q.*  Okay.

21          When you say "investigative files that you maintain

22  in each case," do you mean in each criminal case?

23  *A.*  Yes.

24  *Q.*  Okay.

25          Now, you mentioned a computer system?

**Molina - Direct / Sabelli**

1   *A.*   Yes.

2   *Q.*   Is that computer system part of the Gang Task Force, or is

3   it also a shared computer system with the San Francisco Police

4   Department?

5   *A.*   The San Francisco Police Department system.

6   *Q.*   So the Gang Task Force doesn't have a separate computer

7   system?

8   *A.*   No.

9   *Q.*   Does the Gang Task Force have a separate computer archive

10  of information?

11  *A.*   The FI system was the one we kept.

12  *Q.*   Only the field interview system?

13  *A.*   Yeah, that was shared with the Police Department.

14  *Q.*   And that is shared with the Police Department?

15  *A.*   Yes.

16  *Q.*   And the Gang Task Force, to your knowledge, didn't have any

17  separate computer archives?  When I say "separate," I mean

18  separate from the San Francisco Police Department.

19  *A.*   Not that I can recall.

20  *Q.*   Fair to say, then, that your computers in the Gang Task

21  Force, they were in the same network as the San Francisco

22  Police Department computers?

23  *A.*   Yes.

24  *Q.*   Okay.

25           Now, let's talk about the kind of files that you

**Molina - Direct / Sabelli**

 1   maintained --

 2   *A.*   Sure.

 3   *Q.*   -- within the Gang Task Force.

 4   *A.*   Sure.

 5   *Q.*   Now you keep a kind of file called an alpha file, right?

 6   *A.*   That's correct.

 7   *Q.*   And an alpha file relates to a particular individual?

 8   *A.*   Yes.

 9   *Q.*   A person?

10   *A.*   Yes.

11   *Q.*   And it is classified by that person's name?

12   *A.*   Correct.

13   *Q.*   Do you, within the Gang Task Force, specifically, within

14   the Latino gang section of the Gang Task Force, keep files by

15   any other category, not by individuals' names?

16   *A.*   Umm, when you said "files," you mean folders or you mean

17   cards?  Because we keep the FI cards, we keep the hard copies,

18   and then we enter them into the system.  And we also keep cards

19   with the monikers, which can be called a file because you can

20   go through them.

21   *Q.*   So that I understand, a field interview card, that relates

22   to a person, correct?

23   *A.*   Yes.

24   *Q.*   And a moniker relates to a person, true?

25   *A.*   Correct.

**Molina - Direct / Sabelli**

1   *Q.*  Also, right?

2   *A.*  Correct.

3   *Q.*  So let's put the field interview cards aside and moniker

4   cards aside.

5   *A.*  Okay.

6   *Q.*  Because those are individuals as well, right?

7   *A.*  Correct.

8   *Q.*  I'm asking you a different question:  I'm asking you

9   whether or not you and the Gang Task Force, during the period

10  that you were there, maintained files by any other category

11  besides or apart from by the name of an individual?

12  *A.*  No, just the name and investigating files.

13  *Q.*  The name -- I'm sorry?

14  *A.*  Just by the name of the subject and investigating files in

15  relationship to a criminal investigation.

16  *Q.*  So you had files by an individual's name and files by an

17  incident or a potential crime?

18  *A.*  Correct.

19  *Q.*  Did you keep any files that would be considered MS13 files,

20  for example, a file that says, simply, "MS13" on it?

21  *A.*  We kept binders with police reports.

22  *Q.*  That were related to MS13?

23  *A.*  Yes.

24  *Q.*  So --

25              *THE COURT:*  You say you kept what?

**Molina - Direct / Sabelli**

 1              *THE WITNESS:*  Binders.

 2              *THE COURT:*  Oh, binders.

 3              *THE WITNESS:*  Binders with the collection of

 4    reports.

 5    *BY MR. SABELLI:*

 6    *Q.*  So, in other words, there was a -- you said binders or a

 7    binder?

 8    *A.*  One binder.

 9    *Q.*  Okay.  And that was kept within the Gang Task Force?

10    *A.*  Yes.

11    *Q.*  So presumably, if I understand you correctly, when a crime

12    or a possible crime was considered to be MS13 related, a copy

13    of one of those incident reports would be put into this binder?

14    *A.*  Yeah.  That's as good as the officer who did the follow-up.

15    If the officer didn't put anything in that file, that file

16    stayed the same.

17    *Q.*  You said "as good as the officer who did the follow-up"?

18    *A.*  Right.

19    *Q.*  If the officer did his or her job right, the incident

20    report went into the binder?

21    *A.*  It's not doing it right, it's just if you wanted to put a

22    copy of the report, then you would put a copy of the report.

23    *Q.*  And sometimes they put a copy of the report in and

24    sometimes they didn't?

25    *A.*  Correct.

Molina - Direct / Sabelli

1   Q.  There was no organized or systematic determination of what

2   reports went into that binder; is that true?

3   A.  Correct.

4   Q.  Okay, it was just up to the individual decision of that

5   officer?

6   A.  Correct.

7   Q.  So there is nowhere you can point me to and say, hey,

8   Mr. Sabelli, here is the criteria that were used to determine

9   whether a report made its way to that binder; am I right about

10  that?

11  A.  I don't remember what criteria.  It might have existed, but

12  I don't remember one.

13  Q.  And if it did exist, who would know about it?

14  A.  People that work in the Gang Task Force.

15  Q.  Okay.  And you were one of those people?

16  A.  Right.

17  Q.  And you don't know about it?

18  A.  I don't remember that there was one or not.

19          THE COURT:  He didn't say he doesn't know about it,

20  he said he doesn't remember now.

21          MR. SABELLI:  Okay.

22          THE COURT:  This is 2009 and he left in 2008, so I

23  don't think you quite summarized what he said.

24          MR. SABELLI:  I understand.

25  BY MR. SABELLI:

**Molina - Direct / Sabelli**

1  *Q.*  During the period that you were in the Gang Task Force, did

2  you put any incident reports in that binder?

3  *A.*  Umm, I might have put some of them.

4          *THE COURT:*  Can I ask a question?

5          In the binder, was it incident reports that went in

6  the binder?  Was it photographs?  What went in the binder that

7  you were talking about?

8          *THE WITNESS:*  Incident reports.

9          *THE COURT:*  Incident reports?

10         *THE WITNESS:*  Yeah, investigations.

11         *THE COURT:*  That related to MS13?

12         *THE WITNESS:*  Correct.

13         *THE COURT:*  All right.

14         Was it an inch thick?  Three inches thick?  How

15  thick was it?

16         *THE WITNESS:*  About this big *(demonstrating.)*

17         *THE COURT:*  About an inch and a half?

18         *THE WITNESS:*  Yeah.

19         *THE COURT:*  All right.

20         *THE WITNESS:*  And that was there when I got there in

21  2003, so that was being kept by somebody else when I got there.

22  And that didn't happen too much after that.  It didn't grow

23  after that.

24         *THE COURT:*  Was it still there when you left in

25  2008?

```
 1              THE WITNESS:  Yes.

 2              THE COURT:  All right.

 3              Go ahead, Mr. Sabelli.

 4              MR. SABELLI:  Thank you.

 5   BY MR. SABELLI:

 6   Q.  And so that I understand, sitting here today, you can't

 7   tell us whether or not the system for putting reports into that

 8   binder followed any particular set of criteria?

 9   A.  I don't remember.

10   Q.  Besides the field interview cards, the moniker cards, the

11   alpha files, the incident reports, and this binder that you

12   have just told us about, were there any other types of files or

13   information, storage with respect to Latino gangs within the

14   Gang Task Force during the period that you were there?

15   A.  No.

16   Q.  Was there any file, for example, denominated an informant

17   file?

18   A.  Oh, no.

19   Q.  You didn't have any informant files?

20   A.  No.

21   Q.  Now, you are familiar in this case the ICE agents used two

22   informants, 1211 and 1218?  I won't refer to them by name, but

23   you know that ICE used two informants in this case?

24   A.  They had two sources, yes.

25   Q.  Two sources?
```

**Molina - Direct / Sabelli**

1   **A.**  Yes.

2   **Q.**  You are familiar with that?

3   **A.**  Yes.

4   **Q.**  And you knew both of those people?

5   **A.**  I did.

6   **Q.**  You met them, you have spoken to them face by face -- face

7   to face?

8   **A.**  I have.

9   **Q.**  Within the Gang Task Force, for the period that you were

10  within the Gang Task Force, did you maintain any files with

11  respect to either 1218 or 1211?

12  **A.**  I did not.

13  **Q.**  Did the Gang Task Force do so?

14  **A.**  No.

15  **Q.**  And those were -- were they maintained by any other unit or

16  division or detail within the San Francisco Police Department?

17  **A.**  They were --

18  **Q.**  I'm sorry?

19  **A.**  They were not ours.

20  **Q.**  Okay.

21          My question is, were such files related to 1218 or

22  1211 maintained by any other division or sector or detail of

23  the San Francisco Police Department?

24  **A.**  Not to my knowledge.

25  **Q.**  Not to your knowledge?

**Molina - Direct / Sabelli**

1   *A.*  Correct.

2   *Q.*  So it's fair to say that had you received some information,

3   let's say that it was -- that went to the lack of credibility

4   of 1218 or 1211, there would have been nowhere to put that

5   information?

6          *MS. WAGNER:*  Objection.  Speculation.

7          *MR. SABELLI:*  I don't think so, Your Honor.  He is

8   testifying to his knowledge there is no file for 1218 or 1211

9   within GTF; within his knowledge, there is no file outside of

10  GTF.  I think this court needs to know whether such information

11  would have gone and been stored anywhere.

12         *THE COURT:*  Do you understand the question?

13         *THE WITNESS:*  If I understand it correctly, you are

14  asking me if the San Francisco Police Department or the Gang

15  Task Force maintained any files on 1211 and 1218.  My answer

16  is, not to my knowledge.

17  *BY MR. SABELLI:*

18  *Q.*  That's not my question, I asked you that before.  Here is a

19  different question, okay?

20  *A.*  Okay.

21  *Q.*  If you had received information that 1218 or 1211, either

22  one of these people or both of them, lacked credibility in some

23  way, okay --

24  *A.*  Correct.

25  *Q.*  Fair to say that there would have been nowhere for you to

**Molina - Direct / Sabelli**

1   put that information, either within the GTF, the Gang Task

2   Force, or within the SFPD, the San Francisco Police Department?

3   **A.**  I would have called ICE and told them about it.

4   **Q.**  That's not my question.

5          Do you understand my question?

6   **A.**  Yeah, I understand your question.

7   **Q.**  The San Francisco Police Department, fair to say there

8   would have been nowhere for you to put that kind of information

9   about the lack of credibility or the lack of reliability of

10  either 1218 or 1211?

11  **A.**  No, there was not, not to my knowledge.

12  **Q.**  There was nowhere for you to put it?

13  **A.**  Correct.

14  **Q.**  Were you -- did anybody speak to you about the testimony

15  that Sergeant -- or Officer McDonnell gave in this case?

16  **A.**  Not really, no.

17  **Q.**  All right.  And it's your testimony that the Gang Task

18  Force did not maintain any file denominated MS13?

19  **A.**  As I said before, we have binders that say MS13.  There is

20  a compilation of police reports --

21  **Q.**  Okay.

22  **A.**  -- that get put in there, memorandums and so forth.

23  **Q.**  Apart from that, no other file?

24  **A.**  Not that I can recall, no.

25  **Q.**  Have you seen in your work in the Gang Task Force, not

1   necessarily with respect to MS13, have you seen a memo, any

2   kind of memo entitled a "gang validation memo"?

3   *A.*  Gang validation memo or a form that we use?

4   *Q.*  I'm not talking about a validation for an individual to

5   belong to a gang, that's what you are referring to, right?

6   *A.*  Correct.

7   *Q.*  You are referring to a sheet that has 11 criterion,

8   self-admission being the last one --

9   *A.*  Yes.

10  *Q.*  That says Mr. Herrera is a gang member, Mr. Sabelli is a

11  gang member.  Put those aside.

12  *A.*  Okay.

13  *Q.*  I'm talking about a memorandum that says that MS13 exists

14  and is a gang, a gang validation memo, a memo that validates

15  the existence of a gang; have you ever seen such thing within

16  the Gang Task Force with respect to any gang, whether Latino or

17  African-American, Asian-American, anything?

18  *A.*  Umm, I have written one on MS13.

19  *Q.*  On MS13?

20  *A.*  Yes.

21  *Q.*  A gang validation memo?

22  *A.*  Yes.

23  *Q.*  Okay.

24  *A.*  Not validation, but a memo about the gang itself.

25  *Q.*  Okay.  And where would that be stored?

**Molina - Direct / Sabelli**

```
 1   A.   In that file, in that binder.

 2   Q.   Okay.  Okay.

 3        And do you know when you wrote that?

 4   A.   I would say about 2005, maybe.

 5   Q.   And is that the only gang validation memo that exists with

 6   respect to MS13, to your knowledge?

 7   A.   Once again, it's not a validation memo, it is my knowledge

 8   of the gang.

 9   Q.   Okay.

10   A.   So it's something different when you call it validation.

11   Q.   Sure.  I withdraw that part of it.  Let me ask it again.

12        With respect to MS13, are there any other memos,

13   whether they are written by you or anybody else, whether they

14   were before you were there or after you were there, to your

15   knowledge, is there any other memorandum about MS13 whether

16   it's its history, its structure, its operations?

17   A.   Um-hmm -- I'm trying to think here.

18        I don't recall.  I know I wrote something in 2005.

19   Q.   About how long was it?

20   A.   A page, page and a quarter, I think, two pages.

21   Q.   And when you wrote that, were you using any -- were you

22   writing it based upon your personal knowledge, or were you also

23   relying upon other reports you had read?

24   A.   My personal knowledge, my work in the Mission District for

25   a while, my -- my observations, my knowledge of the gang.
```

**Molina - Direct / Sabelli**

1   *Q.*  And that was in 2005?

2   *A.*  Right.

3   *Q.*  Okay.

4         When you left in 2008, did you write any kind of

5   exit memo about MS13?  Here is what I learned?  Here are my

6   conclusions, here's how it's done --

7   *A.*  No, nothing like that, no.

8   *Q.*  Okay.  You paused; was there something you did write when

9   you left that was different --

10  *A.*  I'm trying to think what I've been doing the last five

11  years.  Just a lot, and it's kind of hard for me to sit here

12  and remember everything that I've done on MS13.

13  *Q.*  Now, you distinguish between the memo that you wrote and

14  what I was asking about.  I was asking about gang validation

15  memos.

16  *A.*  Correct.

17  *Q.*  Do you know what I mean when I refer to a gang validation

18  memo?

19  *A.*  Yes, I do, because there was some officers assigned to the

20  African-American gangs, and they wrote a validation memo for a

21  gang in the northern area of San Francisco, the Northern

22  District.  And they wrote the history of the gang, and how this

23  gang affects the community, and so forth.

24        That's my understanding of validation, you know,

25  under 186.  But I've never done something like that.

**Molina - Direct / Sabelli**

1    *Q.*  To your knowledge, has any San Francisco police officer,

2    whether within the GTF or not, within the Gang Task Force or

3    not, created a gang validation memo?

4    *A.*  Not that I know.

5    *Q.*  To your knowledge, has any San Francisco District Attorney

6    created a gang validation memo for MS13 at any point in time?

7    *A.*  No, not that I know.

8    *Q.*  Now, let me -- let me switch gears to a different area of

9    information, collection and maintenance, and that is the

10   debriefings of informants.

11   *A.*  All right.

12   *Q.*  How do you maintain -- I mean, I think you said you've done

13   a lot with respect to MS13 in the last five years, you know,

14   it's a heavy caseload, there's a lot going on; I assume that

15   over the course of the time that you were part the GTF, you

16   met with many informants or source of the information?

17   *A.*  Correct.

18   *Q.*  How did you maintain information that you got from them?

19   *A.*  Umm, if the person was signed up as an informant, then he

20   went through the process of being an informant.  And he gets

21   signed up, the paperwork is filed, and that gets stored with

22   the investigation department.

23   *Q.*  Okay, so let's start with people who are -- who sign up,

24   okay?

25               So somebody in the beginning isn't signed up; before

**Molina - Direct / Sabelli**

1  they are signed up they come to you, and they talk to you.

2  **A.**  Correct.

3  **Q.**  Okay.  Do you take notes when you speak to them?

4  **A.**  Sometimes.  Sometimes I don't.

5  **Q.**  Let's say that somebody contacts you on the street, maybe

6  he or she is arrested, and they decide they are going to talk

7  to you; you sit down and have a long debriefing with them in

8  the street?

9  **A.**  It's kind of hard to have a debriefing on the street.  We

10  don't do that.

11  **Q.**  You go back to Mission Station?

12  **A.**  Sometimes.

13          I mean, what time period are we talking about?

14  **Q.**  The time --

15  **A.**  This is just a general --

16  **Q.**  The time -- during the time you were in --

17  **A.**  GTF?

18  **Q.**  GTF.

19  **A.**  Umm, I talked to people.  I talked to them in the streets

20  briefly, but I will never have a debriefing in the middle of

21  the street, no.

22  **Q.**  A long debriefing would probably occur at Mission Station

23  or at the Gang Task Force?

24  **A.**  Probably, yes.

25  **Q.**  And when you were there, and somebody -- and you are

**Molina - Direct / Sabelli**

1  participating in a longer debriefing, I assume you are taking

2  notes?

3  *A.* Sometimes I do; sometimes I don't.

4  *Q.* So what happens to those notes?

5  *A.* As far as keeping information?

6  *Q.* Yeah, I mean, when you are done, do you destroy them?  Do

7  they go into a file?  What happens to them?

8  *A.* Some notes, if they were important to me, I keep them.  If

9  not, I go here on my memory.

10  *Q.* Well, I think you've been testifying that it's tough for

11  you to remember everything, right?

12  *A.* Right.

13  *Q.* So fair to say you can't remember all the details of your

14  debriefings.

15  *A.* Right.

16  *Q.* And that's why you take notes?

17  *A.* Right.

18  *Q.* I think you just pointed to your head and said you

19  remembered things.

20  *A.* If there is something about a CI --

21  *Q.* I didn't ask you a question yet.  I'm sorry to interrupt

22  you.

23          So I'm going to go back to my question.  My question

24  is, what happens to those notes?

25  *A.* If there is something about a gang, I will write a memo

**Molina - Direct / Sabelli**

1  regarding that interview with that person and say that on such

2  and such a day I met with that person who provided information

3  about the particular gang.

4  *Q.*  And what happens to those notes and to that memo?  Where do

5  they go?

6  *A.*  The memo goes to my lieutenant.

7  *Q.*  Whoever was the lieutenant in charge?

8  *A.*  At the time, yes.

9  *Q.*  And where does your lieutenant keep those memos?

10  *A.*  Ask them.  I give it to them, and it goes up the chain of

11  command.

12  *Q.*  Well, I thought you just testified that if something was

13  important and you wanted to remember it, you put it in a memo.

14  *A.*  Right.

15  *Q.*  So presumably, at some time you might later want to look at

16  that memo?

17  *A.*  Yes.

18  *Q.*  So you got that memo, you wrote it, you gave it to your

19  lieutenants, now you want to look at it again; where would you

20  go find it?

21  *A.*  I'll go find it -- the officer put it in that binder, the

22  memo might be in that binder.  The lieutenant might have it in

23  his office where the memos goes.

24  *Q.*  As I understood it, what goes into the binder were incident

25  reports.

**Molina - Direct / Sabelli**

```
 1   A.   Yeah, and some memos too, I said.

 2   Q.   But we are talking about memos you have written?

 3   A.   Correct.

 4   Q.   Right?

 5   A.   Yes.

 6   Q.   So I'm asking you, when you have written a memo and you've

 7   given it to your lieutenant and you want to look at it again

 8   because it has something important --

 9   A.   Right.

10   Q.   Where would you go find it?

11   A.   Well, usually keep a copy of my memo.  I give it to the

12   lieutenant.  And I ask the lieutenant, hey, can I get a copy of

13   the memo I gave you?

14         Because it has to be approved.  I write the memo, it

15   goes to my officer in charge, he has to approve it before it

16   continues to goes on.

17   Q.   And where does that memo end up being stored permanently,

18   do you know?

19   A.   Probably in GTF.

20   Q.   Where in GTF?  You were in GTF for a number of years.

21   A.   It would be in the lieutenant's office.

22   Q.   So the lieutenant within GTF has a file or a filing cabinet

23   or a folder with the memos that you and other officers have

24   written about debriefings?

25   A.   I'm not a lieutenant, so I cannot tell you what that
```

**Molina - Direct / Sabelli**

1    lieutenant does.  I can tell you that I give him the memo.

2    **Q.**  Is it your testimony, sir, that you don't have -- you have

3    never talked to your lieutenant about where they keep these

4    memos?

5    **A.**  I ask for copies of it, and he has provided me copies of

6    it.

7    **Q.**  So can give me an example of when you went to a lieutenant

8    and asked for a copy of a memo you have written?

9    **A.**  I'm trying to think of the last time I asked.  I've been

10   out of there for a year, so --

11   **Q.**  If you can't remember, you can't remember.

12   **A.**  I can't remember.

13   **Q.**  Okay.

14            Do you remember any specific lieutenant who would

15   have been at GTF while you were at GTF?

16   **A.**  I had two lieutenants.  I had John Murphy, who is a

17   commander now, and Lieutenant Ferrando.

18   **Q.**  And it's your testimony that both Commander Murphy -- he

19   wasn't a commander at the time, but he is a commander now, and

20   Lieutenant Ferrando kept memos of your debriefings after you

21   had written them and given them to the lieutenant of the GTF?

22            **MS. WAGNER:**  I object.  That misstates the

23   testimony.

24            He said that the memos went up the chain of command.

25   He doesn't know where the lieutenants stored them, if they did.

1          **MR. SABELLI:** Well, Your Honor, this witness has

2    testified that when he wanted to see a copy of a memo that he

3    had written, he would go to the lieutenant in charge of GTF and

4    get a copy back from that lieutenant.

5          **THE COURT:** Please answer this question:  Those

6    memos that you wrote, where in the -- was it the Hall of

7    Justice where you worked?

8          **THE WITNESS:** Yes.

9          **THE COURT:** All right, where in the Hall of Justice

10   were they stored?

11         **THE WITNESS:** I don't know specifically where they

12   were stored.  I know I gave the memos to the lieutenant.  And

13   the lieutenant will, if he signs off on it, he will say make a

14   copy of it, and they will give me a copy.

15         **THE COURT:** Where did you keep your copy?

16         **THE WITNESS:** I would put it on my desk.

17         **THE COURT:** It would pile up after a while.

18         **THE WITNESS:** I know.

19         **THE COURT:** You must have put them somewhere.

20         **THE WITNESS:** I know.

21         **THE COURT:** Where did you put them?

22         **THE WITNESS:** Put it in my drawers, in my desk, a

23   file.

24         **THE COURT:** So did you have a file that you kept?

25         **THE WITNESS:** I kept a file with memos and stuff.

**Molina - Direct / Sabelli**

1              *THE COURT:*  Like a desk file?

2              *THE WITNESS:*  Yes.

3              *THE COURT:*  Does it have a name?

4              *THE WITNESS:*  Memos.

5              *THE COURT:*  All right.  So what did you do with that

6    when you left the Gang Task Force?

7              *THE WITNESS:*  Umm, I don't know what happened to

8    them.  I left, and they took everything away from my desk, and

9    they gave it to somebody else.

10             *THE COURT:*  Did you take anything with you when you

11   left the Gang Task Force?

12             *THE WITNESS:*  No.  Some of my property is still

13   there in the locker locked away.  I thought I was going to be

14   gone for a few minutes --

15             *THE COURT:*  When the copies that went up the chain

16   of command -- you know, you are an experienced guy there --

17             *THE WITNESS:*  Yeah.  The lieutenant will keep them

18   in his office, maybe.  I understand that.  He will keep them in

19   his office.  He will send it up the chain of command.

20             But I know if I need a copy, or something, for

21   training, training reasons, I will ask the lieutenant, can I

22   get a copy of the memo, and then he will give me a copy.  He's

23   got file cabinets there.

24             *THE COURT:*  All right.

25             Do you have any information, based on your

**Molina - Direct / Sabelli**

1    experience, where they were stored?

2            **THE WITNESS:**  I can -- I don't want to assume, but

3    they should be in GTF because that is where the unit keeps --

4    anything GTF --

5            **THE COURT:**  Gang Task Force, all right.

6            **THE WITNESS:**  Because that unit keeps their own

7    files.

8            I know the memo goes out to the Chief of Police or

9    the captain.  The captain is the ultimate person that signs off

10   on memos.  Every memo that we write in the Police Department is

11   addressed to the captain, but before it gets to the captain in

12   charge of that department, it gets reviewed by the lieutenant.

13   And the lieutenant will initial that memo, saying, okay, it's

14   good, this memo, send it up.  And that memo goes up the chain

15   of command.

16           I don't know what happened after it leaves the

17   lieutenant's office.  He may make a copy and keep them in his

18   files.  I don't know whether that's a practice or not.

19           **THE COURT:**  We need to bring this to a close; how

20   much longer do you have?

21           **MR. SABELLI:**  Well --

22           **THE COURT:**  We are beating -- look, I think the

23   Court has been very generous in giving you time.  And you go

24   over the same things repeatedly.  I'm going to give you some

25   more time, but we need to be efficient in the use of your time.

**Molina - Direct / Sabelli**

1  Figure out how you are going to use it.  And we are going to

2  bring it to an end.  Most judges would never even entertain

3  this evidentiary hearing.

4         *MR. SABELLI:*  Your Honor, I'm not in a position to

5  comment on that, but I will say, this is a death penalty case,

6  there is a great deal of confusion --

7         *THE COURT:*  No, it's not a death penalty case.

8         Have you filed a notice, Mr. Leung?

9         *MR. LEUNG:*  No, Your Honor.

10        *MR. SABELLI:*  It's a potential capital case.

11        *THE COURT:*  Yes, it is, but that does not give you

12  the right to make these kind of inquiries ad infinitum.

13        *MR. SABELLI:*  May I respond?

14        *THE COURT:*  I'm giving you a reasonable opportunity

15  to find out how they store the information, and we are going to

16  continue it, but it's not going to go on forever.  So you need

17  to marshal your time and try to finish this in the next 25

18  minutes with this witness.

19        *MR. SABELLI:*  That's fine, Your Honor, but I want to

20  say this, because I feel this is important to say:  I am asking

21  direct questions, I am not getting direct answers.  And I think

22  the Court is in a position to observe for itself whether or not

23  the testimony is direct or simple.

24        *THE COURT:*  Some of it is direct and some of it is

25  not.  And sometimes the question lends itself to the answers he

**Molina - Direct / Sabelli**

1    is giving.

2              I will ask the witness be as straightforward as you

3    can so that we can bring this to an end.  If I think that you

4    are being a little evasive, I'm going to give the counsel more

5    time.  So try to -- I want -- I want the counsel to know if

6    there were documents -- let them have them.  But I don't want

7    you to invent testimony just to make me happy.  But I also want

8    you to be forthright in telling us where these records are, if

9    they exist.

10   *BY MR. SABELLI:*

11   *Q.*  I'll ask simple questions.  Hopefully, you can answer

12   simply, okay?  Fair enough?

13   *A.*  Okay.

14   *Q.*  You took notes during debriefings with informants or

15   potential informants?

16   *A.*  Correct.

17   *Q.*  What happened to those notes?

18   *A.*  If I need them, I keep them.  If not, I throw them away.

19   *Q.*  And the notes you didn't throw away, where are they now?

20   *A.*  I don't know.  If I bring my desk, probably destroyed.

21   *Q.*  You wrote memos about debriefings with potential informants

22   and informants; where are those memos today?

23   *A.*  I can count -- probably with my hand I can count how many

24   memos I wrote about informants.  And most of therm were

25   Norteño, not even MS13.

**Molina - Direct / Sabelli**

1    *Q.*  And where are those memos today?

2    *A.*  Well, as I said before, I submitted it to the lieutenant,

3    and if I made a copy, I put it in the binder.

4    *Q.*  Is it fair to say you don't know where they are?

5    *A.*  They should be with the police department.

6    *Q.*  Is there a file that you maintained at any point when you

7    were part of the GTF that collected all of the debriefings or

8    the memos about debriefings that you made with informants?

9    *A.*  See, when you say debriefing with informants, what you

10   call -- what do you call debriefings?  I talked to people, I

11   don't consider that a debriefing.  I talk to people all the

12   time, but I don't sit down and say, okay, tell me about this,

13   tell me about that.  I talk to them.  But I tell you --

14   *Q.*  If you took notes or wrote a memo, if you decided it was

15   important to take notes or write a memo, where would those end

16   up within your --

17           *THE COURT:*  That's compound, so let's take it one at

18   a time.

19           If you took the notes -- they're like handwritten

20   notes; is that what we are talking about?  Yes or no?

21           *THE WITNESS:*  Yeah, handwritten notes.

22           *THE COURT:*  All right, so let's say you took

23   handwritten notes; did you have a practice of keeping those

24   notes like in a file, a notebook, a desk drawer, anything?  Did

25   you have that practice at the time?

**Molina - Direct / Sabelli**

1   **A.**  Umm, keeping notes on informants?  Not really.  I mean, I

2   will keep notes on my writing pads, and that was that.  If I

3   wrote a memo, everything in those notes -- if I wrote a memo --

4

5           **THE COURT:**  I'm not clear on what you are saying.

6           Let's say you took the notes.  There are several

7   possibilities that come to mind, you tell me.  One is you kept

8   them.

9           **THE WITNESS:**  Correct.

10          **THE COURT:**  One is you kept them until you wrote the

11  memo, then you threw them away.  One is that you did both:  You

12  might have kept the memo and you kept the notes, and that maybe

13  you didn't keep the notes always, maybe some you threw out, it

14  depended on how voluminous it was and how detailed it was.

15  There are -- many different possibilities come to mind.

16          And so you tell us what your practice was at the

17  time about how you would keep notes and how they got

18  transformed into memos and which ones you kept and didn't keep

19  with respect to the information you got from informants.

20          **THE WITNESS:**  I understand, Your Honor.  And once

21  again, just being upfront here, I didn't have too many

22  debriefing sessions with informants, you know?  I talked to

23  people; if I thought that those notes were important, I would

24  transcribe those notes to the memo, I would write the memo and

25  get rid of the notes.  Because everything that was in essence

**Molina - Direct / Sabelli**

```
 1    from the notes will go in that memo.  And that was my practice.

 2              I didn't go and have debriefings, extensive

 3    debriefings with informants, I didn't do that.  I talked to

 4    everyone.  I didn't keep a set of informants.

 5              THE COURT:  All right, I think this is about the

 6    best you are going to get, Mr. Sabelli.

 7              MR. SABELLI:  All right.

 8              THE COURT:  Time to move on to a new subject.

 9              MS. WAGNER:  Your Honor, may I pose some questions

10    of the witness?

11              THE COURT:  Can you wait until Mr. Sabelli is done?

12              MS. WAGNER:  Yes, Your Honor.

13              THE COURT:  All right, let's continue on.

14    BY MR. SABELLI:

15    Q.  Changing gears, with respect to 1218, did you personally

16    maintain a file with respect to 1218?

17    A.  No.

18    Q.  How about 1211?

19    A.  No.

20    Q.  To your knowledge, did anyone within GTF maintain a file

21    with respect to 1218?

22    A.  No.

23    Q.  How about 1211; anybody within GTF keep a file with respect

24    to 1211?

25    A.  No.
```

**Molina - Direct / Sabelli**

1  *Q.*  If you learned information that undermined the reliability

2  or credibility of 1211 or 1218, I think you said before you

3  would have called ICE?

4  *A.*  I would have, yes.

5  *Q.*  Did you ever do that?

6  *A.*  No, not that I can recall, no.

7  *Q.*  So your testimony is, you never called ICE to say, hey,

8  I've discovered that 1218 did such and such a thing that

9  undermines his credibility or 1211 did such and such a thing

10  that undermines his credibility?

11  *A.*  I don't have a personal recollection that I ever did that.

12  *Q.*  That would probably stand out in your mind, right?

13  *A.*  It probably would.  I don't have a recollection.  Yeah, I

14  don't have a recollection of doing that.

15  *Q.*  Changing gears again, did you, within GTF, you or any other

16  officer within GTF, maintain files for people who were not gang

17  members but were associates of a gang?

18  *A.*  Associates.  I don't recall that, no.

19  *Q.*  So is it -- is your testimony you didn't do it, or you just

20  don't recall it?

21  *A.*  We had FI cards that would name somebody, an associate

22  field interview cards.  If that person was seen with nongang

23  members hanging out with nongang members wearing clothes, but

24  we don't have the criteria to call them members.  We call them

25  associates because these were associating with gang members.

**Molina - Direct / Sabelli**

1   *Q.*  And did you maintain files with associates?

2   *A.*  I don't recall.

3   *Q.*  Or associates of a gang, rather.

4   *A.*  I don't remember whether there was FI cards, though.

5   *Q.*  To your knowledge, did the Mission Street Police Station

6   keep a separate set of files or document related to MS13?

7   *A.*  At what time period?

8   *Q.*  During the period of time that you were in the Gang Task

9   Force.

10  *A.*  No.  Not that I know of.

11           *THE COURT:*  It is a little unclear to me.

12           Separate from -- separate from the Hall of Justice

13  or separate from --

14           *MR. SABELLI:*  Separate from GTF, Your Honor.

15           *THE COURT:*  So rephrase the question with that --

16           *MR. SABELLI:*  I will.

17           *THE COURT:*  -- qualification in mind.

18           *MR. SABELLI:*  Thank you.

19  *BY MR. SABELLI:*

20  *Q.*  We've been talking about the files and the documents and

21  the information maintained by the Gang Task Force.

22  *A.*  Correct.

23  *Q.*  I'm now going to ask you about the Mission Street Police

24  Station.

25  *A.*  Okay.

**Molina - Direct / Sabelli**

 1   *Q.*  There were police officers there who had extensive

 2   contacts, fair to say, with MS13 members?

 3   *A.*  Correct.

 4   *Q.*  At the Mission Street Police Station, was there any system,

 5   whether it was formal or informal, any system whatsoever for

 6   maintaining information related to MS13?

 7   *A.*  FI cards.  They fill out the FI cards, they put them in the

 8   system and send it to --

 9              *THE COURT:*  What kind of cards?

10              *THE WITNESS:*  Field interview cards.

11              *MR. SABELLI:*  FI, Your Honor, field interview cards.

12              *THE WITNESS:*  Yeah.  That was collected by officers

13   at Mission Station.  They would put it in the system and send

14   it to GTF.

15   *BY MR. SABELLI:*

16   *Q.*  As a GTF member -- officer, rather, with a specialty in

17   Latino gangs, did you work with Mission Street police officers

18   who had contacts with MS13 members?

19   *A.*  Yes, I did.

20   *Q.*  Did any of those officers ever provide notes or memoranda

21   or reports to you related to MS13?

22   *A.*  Not that I remember.  I don't remember.

23   *Q.*  You don't remember over the entire course of being in GTF

24   whether or not you ever worked with a Mission Street police

25   officer who gave you a handwritten note or a memo or a report

**Molina - Direct / Sabelli**

1  or anything related to MS13?

2  **A.**  Not at this time, no.  I mean, been such a long time.

3  **Q.**  You left in August of '08?

4  **A.**  I left the Gang Task Force, yeah, just about August '08.

5  **Q.**  About a year and a month ago?

6  **A.**  Yes.

7  **Q.**  And you don't have any memory of that?

8      **THE COURT:**  Well, you mean memory of somebody giving

9  him the memo?

10  **BY MR. SABELLI:**

11  **Q.**  Or a report or handwritten notes, or anything like that.

12  No memory?

13  **A.**  You're talking about a period of five years; I don't have

14  any specific recollection unless you had something that can

15  refresh my recollection.

16  **Q.**  While you were a member of the Gang Task Force, would you

17  go to Mission Street Police Station to interview MS13 members?

18  **A.**  Correct.

19  **Q.**  That would happen?

20  **A.**  Yes.

21  **Q.**  From time to time?

22  **A.**  In criminal investigations, yes.

23  **Q.**  And when you were there, did you observe that the Mission

24  Street Police Station, or Mission Street officers maintained a

25  mug book of pictures of MS13 members?

**Molina - Direct / Sabelli**

 1    *A.*  Mug shots, yeah, come with the police department.

 2    *Q.*  And was that in a folder?  Was that in a folder, those mug

 3    shots?

 4    *A.*  Of MS13, they can maintain photos of all the people that

 5    get arrested in Mission Station.

 6    *Q.*  And did the Mission Street police officers maintain a

 7    folder with mug shots or photographs of MS13 members?

 8    *A.*  I don't -- I don't remember.

 9    *Q.*  Did the MS -- did the Mission Station police officers

10    maintain any folders or binders or any kind of information in

11    some system, whether formal or informal, with respect to MS13?

12    *A.*  No, not that I know of.

13    *Q.*  Did you ever -- let's change gears.

14            Did you ever purge information from the Gang Task

15    Force?

16    *A.*  Purge information from the Gang Task Force -- what do you

17    mean?

18    *Q.*  Get rid of information.

19    *A.*  Umm --

20    *Q.*  In any form?

21    *A.*  I shred some files.  2003, there were files from like few

22    years back that were not used anymore, so they were being

23    destroyed.  And I would put them in a box, and they would

24    destroy them.

25    *Q.*  So your testimony is that you did that in 2003?

**Molina - Direct / Sabelli**

1   *A.* When I got there, they were cleaning up the office because

2   a lot of people were retiring and there were boxes of things

3   that had names on it. So that was destroyed because we didn't

4   know what --

5   *Q.* So is it your testimony that the only time that you purged

6   or got rid of any information while you were in the GTF was in

7   2003 when you first joined the Gang Task Force?

8   *A.* Well, personally, I didn't destroy it. We put -- we put

9   files and stuff that was left behind to be destroyed.

10  *Q.* Okay.

11  *A.* I didn't do that, personally.

12  *Q.* Okay.

13  *A.* It was just set aside.

14  *Q.* Back in 2003, you didn't personally destroy anything?

15  *A.* No.

16  *Q.* You segregated things that you understood would be

17  destroyed?

18  *A.* Yes.

19  *Q.* Apart from that episode at the beginning of your time in

20  the Gang Task Force, were you ever responsible for directly or

21  indirectly purging information from the Gang Task Force?

22  *A.* No.

23  *Q.* Did you ever purge informant files?

24  *A.* No.

25  *Q.* Did you ever say this person is no longer a gang member,

**Molina - Direct / Sabelli**

1   let's get rid of this person's file?

2   *A.*  Not any specific recollection, no.

3   *Q.*  So let me give you an example.

4           If someone was a gang member and then became an

5   informant, did you ever give an order or -- directly or

6   indirectly, to get rid of a file related to that person?

7   *A.*  No.

8   *Q.*  So it's your testimony that -- that you were never

9   responsible for getting rid of in any way any file related to

10  any informant?

11  *A.*  That's my testimony, correct, yeah.

12  *Q.*  And you are certain about that?

13          *MS. WAGNER:*  Objection.  Asked and answered.

14          *THE WITNESS:*  A hundred percent, why don't I do

15  that.

16  *BY MR. SABELLI:*

17  *Q.*  And apart from that example that I just gave you, were

18  you -- at any other point in time, did you get rid of any

19  information, whether it was an entire file or part of a file

20  while you were in the Gang Task Force?

21          And again, we are forgetting -- we are putting aside

22  this episode that happened when you just got there in 2003.

23  *A.*  Uh-huh.

24  *Q.*  Forget that episode for now, we will ask about that in a

25  second.

**Molina - Direct / Sabelli**

1              While you were in the Gang Task Force, did you ever

2    purge or get rid of any information that may not have been an

3    entire file, but was part of a file?

4    *A.*   No.

5    *Q.*   And I'm going to ask you to think about that specifically

6    with respect to any informant.

7              When you say "no," you mean, no, I never did that,

8    right?

9    *A.*   No.   Why would I do that?

10   *Q.*   I'm not in a position to answer your questions, but I'm

11   asking you:   When you say, no, to understand your "no," you are

12   not arguing with me, you are saying, yes, I never did that; is

13   that correct?

14   *A.*   That's correct.   I don't have the power to do that.

15   *Q.*   To your knowledge, within the Gang Task Force is there any

16   formal system for purging files, for purging information?

17   *A.*   Is there any system that I can think of when I was there?

18   No.

19            **MR. SABELLI:**   Your Honor, that's all I have for this

20   witness.   Thank you.

21            **THE COURT:**   All right, thank you.

22            Ms. Wagner, you said you had some questions.

23            **MS. WAGNER:**   Thank you, Your Honor.

24   ///

25   ///

1              CROSS-EXAMINATION

2    *BY MS. WAGNER:*

3    *Q.*  Sergeant Molina --

4              *THE COURT:*  Let's use the microphone.

5    *BY MS. WAGNER:*

6    *Q.*  Sergeant Molina, when you draft a memorandum, that is a

7    document that communicates information up through the chain of

8    command of the Police Department; isn't that right?

9    *A.*  That's correct.

10   *Q.*  So it was your custom and practice during the relevant time

11   periods to use whatever information you obtained during an

12   investigation in order to draft a memorandum if you thought it

13   was important that it go upward through that chain of command?

14   *A.*  That's correct.

15   *Q.*  And you were trained at the academy and beyond by the

16   San Francisco Police Department?

17             *MR. SABELLI:*  Sorry, couldn't hear the question.

18             *THE COURT:*  Start over again on that one.

19   *BY MS. WAGNER:*

20   *Q.*  You received training within the San Francisco Police

21   Department relative to making notes and reducing them to

22   investigative reports, correct?

23   *A.*  Correct.

24   *Q.*  And didn't that training tell you that once you had reduced

25   your investigative notes into a report, it was all right to

**Molina - Cross / Wagner**

1    discard them?

2    *A.*   Yes.

3    *Q.*   Please describe how you would draft a memorandum.

4    *A.*   I will do the heading.  It's addressed to the captain of --

5    if I was in the Gang Task Force, it would be the captain with

6    investigation section of it.  And I would put where is it from,

7    which is me, the day and time, the subject, and the reasons I

8    was writing it:  Sir, this is to inform you that on such and

9    such a day I contacted a person who refers as a confidential

10   reliable informant, and put the information I need to put on.

11   *Q.*   When you describe a heading, you are talking about a form

12   document?

13   *A.*   A memorandum for the Police Department, yes.

14   *Q.*   And when you delivered it to your lieutenant, you testified

15   earlier that it required his signing off by way of initials;

16   isn't that right?

17   *A.*   That's correct.

18   *Q.*   And if that were done, would you consider that to be an

19   approval of the substance of your memorandum?

20   *A.*   It would be approved by my lieutenant, yes.

21   *Q.*   And thereafter, did you know, necessarily, what would

22   become of the memorandum?

23   *A.*   Umm, it will go up the chain of command.

24   *Q.*   That wasn't your decision, though, was it, it would be the

25   lieutenant's thereafter, wouldn't it?

**Molina - Cross / Wagner**

 1   **A.**   That's correct.

 2   **Q.**   With respect to any notes that you might have used in

 3   drafting your memorandum, you would have discarded them,

 4   perhaps?

 5   **A.**   Yeah, I would not keep notes.  If I use them, I would put

 6   in a memorandum.  If I did not, I will destroy them.

 7   **Q.**   You testified earlier about putting memoranda into the

 8   binder that related to the MS13 within the Gang Task Force unit

 9   at the Hall of Justice?

10   **A.**   Correct.

11   **Q.**   That's -- is that the same kind of memorandum?

12   **A.**   Yes.

13   **Q.**   With respect to incident reports, when you were conducting

14   investigations as a member of the Gang Task Force, did you,

15   yourself, draft incident reports?

16   **A.**   All the time.

17   **Q.**   And that, it's fair to say, would be a reduction of field

18   notes, interviews, information that you collected, and so on?

19   **A.**   That's correct.

20   **Q.**   And once the incident report was drafted, was it reviewed,

21   then, by somebody else besides yourself?

22   **A.**   Yes.

23   **Q.**   Somebody who was your commanding officer?

24   **A.**   It would be my sergeant at the time.  The first supervisor

25   is a sergeant, and then it goes to a lieutenant.

**Molina - Cross / Wagner**

1  *Q.* And it's correct to say that those investigative -- the

2  incident reports that you drafted that were thereafter

3  approved, would be filed by incident number?

4  *A.* Yes.

5  *Q.* And that's true, also, within the Gang Task Force as in a

6  direct station?

7  *A.* That's correct.

8  *Q.* Are you responsible for the method of storing information

9  at Mission Station?

10 *A.* No.

11       *MR. SABELLI:* Just in terms of time frame, I'm just

12 going to object to vague and move to strike.  Is that the

13 reference to the period during which Mr. Molina was with GTF?

14       *THE COURT:* All the answers that you just gave to

15 Ms. Wagner's questions, were you answering with respect to the

16 period that you were at the GTF?

17       *THE WITNESS:* Yes, for 2003 to 2008.

18       *THE COURT:* All right.  Thank you for the

19 clarification.  Counsel is correct, all those questions were --

20 it's fixed.

21       All right, anything more?

22       *MS. WAGNER:* Nothing further, Your Honor.

23       *THE COURT:* Anything on redirect?

24       *MR. SABELLI:* No, thank you, Your Honor, Your Honor.

25       *THE COURT:* Okay.  May the witness be excused?

1          *MR. SABELLI:*  Yes, Your Honor.

2          *THE COURT:*  All right.

3          Thank you, Sergeant.  You are free to go.

4          *THE WITNESS:*  Thank you.

5          *THE COURT:*  Let's bring in our other witness.  You

6   still want to examine the other witness?

7          *MR. SABELLI:*  I do, Your Honor.  Thank you.

8          *THE COURT:*  All right, let's do that.

9          *MR. SABELLI:*  Your Honor, the defense calls

10  Ernest Ferrando.

11                    **ERNEST FERRANDO,**

12  called as a witness for the defendant, having been duly sworn,

13  was examined and testified as follows:

14          *THE COURT:*  Say your name again.

15          *THE WITNESS:*  Hi.  How you doing.

16          *THE COURT:*  Lieutenant?  Sergeant?  What?

17          *THE WITNESS:*  Lieutenant Ferrando, sir.

18          *THE COURT:*  Lieutenant.

19          Welcome.  Please raise your right hand and we'll

20  swear you in.

21          Go ahead.

22          *THE CLERK:*  Okay.

23                    **(Witness sworn.)**

24  ///

25  ///

Ferrando - Direct / Sabelli

1                    DIRECT EXAMINATION

2  *BY MR. SABELLI:*

3  *Q.*  Good afternoon, Lieutenant.

4  *A.*  Good afternoon.

5  *Q.*  Can you tell the Court, please, during what periods of time

6  you worked in the Gang Task Force of the San Francisco Police

7  Department.

8  *A.*  Okay.  I started in the Gang Task Force in 1989 as an

9  investigator.  In 1993, I got promoted to sergeant.  Went out

10  to Northern Station for a year, came back in 1995.  Continued

11  to work in Gang Task Force through 2003.  Got promoted to

12  lieutenant.  Went out to FOB Operations Patrol again for three

13  years.  Went back to Gang Task Force in 2006 as a lieutenant.

14  And I've been there up to now.

15  *Q.*  From 2006 through 2009, you've been in the Gang Task Force?

16  *A.*  That's correct.

17  *Q.*  And I'll refer to that as GTF, so if I say GTF, you

18  understand that I'm talking about the Gang Task Force?

19  *A.*  Yes, I do.

20  *Q.*  Okay.

21          And in your answers this afternoon, Lieutenant, if

22  there is an important distinction to be made between SFPD,

23  generally, or the GTF, specifically, can you please make that

24  for us?

25  *A.*  Absolutely.

**Ferrando - Direct / Sabelli**

1   *Q.*  Okay.  All right, thank you.

2                    **(Witness coughing.)**

3              *THE WITNESS:*  Excuse me.

4   *BY MR. SABELLI:*

5   *Q.*  Do you need a glass of water, sir?

6   *A.*  I'm sorry, what?

7   *Q.*  Would you like a glass of water?

8   *A.*  No, I'm fine.

9   *Q.*  Let me start by asking you about how information is kept in

10  the Gang Task Force.  And let's talk about the period 2006

11  through 2009, okay?

12  *A.*  Okay.

13  *Q.*  The first thing I want to know is, is there some sort of

14  formal protocol for the way in which GTF officers are supposed

15  to collect information, maintain it, store it?  Is there any

16  formal protocol?

17  *A.*  There is protocol as far as GTF sort of becomes a

18  clearinghouse for information received through the department,

19  Gang Task Force, GTF, same unit.  We collect reports,

20  interdepartmental memos, field interrogation cards, and

21  information that comes from outside agencies or other

22  departmental memos.  We are kind of like the clearinghouse for

23  information that comes through.

24          Then it gets decimated *(sic)* to the active gang, the

25  gang that's involved in that specific areas of gang expertise.

**Ferrando - Direct / Sabelli**

1    The unit's divided up into three areas.

2              Am I going too fast?

3              ***THE COURT REPORTER:***  Um-hmm.  That's okay.

4              ***THE WITNESS:***  Asian gangs, Latin gangs and

5    African-American gangs.  All three of those gang expertise

6    areas have team leaders.  That team leader is supposed to get

7    the information, decimate it amongst the other team members

8    within that gang function.  So basically, we are the

9    clearinghouse of information that comes through.

10   *BY MR. SABELLI:*

11   *Q.*  Okay.  And let's talk about how that information is then

12   stored within GTF.  And let's take as an example, a memorandum

13   of a debriefing of an informant done by a GTF officer.

14   *A.*  Okay.

15   *Q.*  Okay?  What would happen, typically, to a memorandum like

16   that?  How would that be -- how would that be decimated, as you

17   say within the system, or distributed?  And where would it end

18   up being stored?

19              ***THE COURT:***  Wait, let's be clear.

20              When you say decimated, that means, to me, you take

21   a knife and you chop it up.  I don't think you really mean

22   that, I think you mean something else.

23   *BY MR. SABELLI:*

24   *Q.*  You mean distributed?

25   *A.*  Distributed.  I'm sorry.

Ferrando - Direct / Sabelli

1    Q.  That's fine.

2               THE COURT:  Somebody will accuse you of destroying

3    evidence.  They will say you were over there decimating

4    evidence.

5               MR. SABELLI:  I adopted the witness' terminology, so

6    I wouldn't have been making that accusation.

7               THE COURT:  Okay.  Okay.

8    BY MR. SABELLI:

9    Q.  So distributing, we are on the same page, we are talking?

10   A.  Okay, distributing.

11   Q.  So I was just asking you to talk through an example with us

12   of a memo, of a debriefing of an informant within GTF.  A GTF

13   officer writes a memo, let's say in 2007, square within the

14   period that you are there, that Sergeant Molina was there, that

15   memorandum is given to you, the lieutenant; is that correct?

16   A.  That's correct.

17   Q.  You would approve it?

18   A.  That's correct.

19   Q.  And then what would you do with it?

20   A.  Well, the memo comes to me for initial approval.  And it

21   would then be pushed up my chain of command to the Captain, who

22   ultimately approves -- who is my commanding officer --

23   ultimately approves the memo.

24               Informant memos are handled in different ways

25   because you could have an informant, a confidential informant

1  that could be a paid informant, so that could go into an

2  informant file.  Or, it could be information received from an

3  informant that is not reliable.  There is different levels of

4  informants, as we know, an informant that is not reliable or

5  information received from a person that an officer is talking

6  to out in the street.

7          So the memos could go in different areas of our

8  filing system, but basically, the memo would go into an alpha

9  file of the person who is involved in that memo or who the memo

10  is talked about or referred to.

11  *Q.*  Okay.  So I'm going to ask you to talk about all these

12  different options.  And that is going to be an important part

13  of what we are talking about here today.  I want you to guide

14  us through it.

15          The first thing is this:  When somebody gives you

16  that kind of debriefing memo, are they supposed to keep a copy

17  of it, or are they supposed to give you the only copy?

18  *A.*  I should get the original copy to be signed by myself.

19  *Q.*  And is it your understanding that the person who gave you

20  the memo is supposed to keep a copy or not keep a copy?

21  *A.*  Once it's approved by myself, they can keep the copy

22  because it's already got the initial approval.

23  *Q.*  Once it's approved by you, do you give a copy back to them?

24  *A.*  It depends if the memo is in the nature -- it needed to be

25  acted on right away before it gets pushed up.  I could handle

**Ferrando - Direct / Sabelli**

1   an approval by a phone call if the memo is important in nature,

2   where I could tell my captain, here is what we have coming your

3   way a lot of the time.

4   **Q.**  So let's say you approve the memo, let's say you approve a

5   memo, okay; whether it's quickly or not --

6   **A.**  Okay.

7   **Q.**  -- you've got an approved memo; do you give a copy of that

8   back to the officer who gave you the memo?

9   **A.**  Eventually, it gets back to him, yes.

10  **Q.**  And that is part of the protocol?

11  **A.**  Yes.

12  **Q.**  Now let's talk about going the other direction.  You've got

13  a memo, and you are going to send it up the chain of command.

14  **A.**  Yes.

15  **Q.**  Let's assume it's a paid informant, what happens with that

16  memo?

17  **A.**  If it's a paid informant, the memo would be attached --

18  eventually, we have a form that is used that we keep track of

19  currency and currency out that we pay informants.  There is

20  also a small piece of paper that gets put with the amount that

21  is given to the informant attached to a voucher, we call it.

22  The memo also would be attached -- attached to that voucher and

23  the sheet that keeps track of the money given out, expenses

24  given out by a certain officer, and then put in the memo's CI

25  file.

**Ferrando - Direct / Sabelli**

1  *Q.*  And you said the CI file.

2  *A.*  Yes.

3  *Q.*  Meaning the confidential informant file?

4  *A.*  If he's verified and he has a confidential informant number

5  and has been classified as informant, meets our parameters in

6  the department, then it goes into that file.

7  *Q.*  Where is that CI file maintained?

8  *A.*  The CI file is maintained in Room 400 in the Bureau of

9  Investigations.

10  *Q.*  And the Bureau of Investigations is obviously outside of

11  the GTF?

12  *A.*  That's correct.

13  *Q.*  So the informant information related to a CI would go to

14  the Bureau of Investigations in Room 400?

15  *A.*  If it's a numbered CI.

16  *Q.*  If it's a numbered CI?

17  *A.*  Right, not all CI information.

18  *Q.*  Okay, that is the course that a debriefing memo would run

19  if it was a numbered CI?

20  *A.*  That's correct.

21  *Q.*  And by the way, do Gang Task Force officers have access to

22  those numbered CI memos in Room 400?

23  *A.*  No.

24  *Q.*  Now, if it's a non-numbered CI, or non-numbered informant,

25  rather, where would the memo go?

**Ferrando - Direct / Sabelli**

1    *A.*  Well, the memo goes in two areas.  It goes into the alpha

2    file that is kept, if there is an alpha file.  There is an

3    alpha file kept on the gang members.  And then another copy

4    would go into -- there would be Latin gangs, African-American

5    gangs and Asian gangs, so a copy would go into that file so we

6    keep track of all the filings done on specific gangs.

7    *Q.*  Okay.  So let's take two of those separately.

8            So in your example, if I'm -- let's say that

9    Mr. Herrera, my client --

10   *A.*  Yes.

11   *Q.*  -- is an informant, and he is informing about me, he says

12   Sabelli is a gang member, okay?  That debriefing memo, based

13   upon what Mr. Herrera said, would go into my alpha file; right?

14   That's what you're saying?

15   *A.*  Correct, it should be put in there.

16   *Q.*  In other words, it doesn't go into the alpha file of the

17   informant, it goes into the alpha file of the target?

18   *A.*  That's correct -- well, it would go -- if the informant is

19   informing, giving information about something, the -- if it's a

20   paid informant, as I said earlier, then we have to justify the

21   reason why the informant was paid.  So a copy of that memo, if

22   it was paid information, would go into the CI file.

23           The person that the CI is talking about, a copy

24   would be put in that file for information gathering.

25   *Q.*  In the file that the CI is talking about?

**Ferrando - Direct / Sabelli**

 1  *A.*  Correct.

 2  *Q.*  And then you said that a copy would also go into either the

 3  Latin gang section or the African-American gang section or the

 4  Arab-American gang section?

 5  *A.*  Those are the three.  We also have other sections,

 6  motorcycle gangs.

 7  *Q.*  Sure, okay, but let's talk about the Latin gang section.

 8  *A.*  Okay.

 9  *Q.*  What file is that?  Where is that?

10  *A.*  It's kept in the lieutenant's office.

11  *Q.*  Which lieutenant?

12  *A.*  Myself.

13  *Q.*  And --

14  *A.*  Whoever is in charge of that gang unit at the time.

15  *Q.*  What is that file called?

16  *A.*  It's called interdepartmental memos, Latin gangs by

17  members.

18  *Q.*  Okay.  And that is under lock and key in your office?

19  *A.*  That's correct.

20  *Q.*  When did that file first -- when was that file first

21  created?

22  *A.*  It was there before I got there, so before 2006.  I'm not

23  sure exactly when it was created.

24  *Q.*  And is it still there?  Do you still maintain it?

25  *A.*  Yes.

**Ferrando - Direct / Sabelli**

1  **Q.**  Is it your understanding that maintaining that file is part

2  of the protocol for maintaining information within the GTF?

3  **A.**  I think it doesn't go along with protocol or maintaining

4  information, I think the key to keeping a file there is a

5  cross-referencing and just to have another copy available.

6          An example was when we did the injunctions, we had

7  to do specific gangs.  And in order to not have to go through

8  individual files, which is very work cumbersome, we would have

9  a file of Latin gang files with all the memos in it.  So if

10  somebody came, the city attorney wanted to see specific gangs,

11  all the files would be kept together.

12          I don't think there is a specific protocol, it's

13  just --

14  **Q.**  It makes sense?  It's common sense?

15  **A.**  Yes.

16  **Q.**  Okay.  And in that Latin gang section within your office,

17  is there a file called MS13?

18  **A.**  No.

19  **Q.**  It's all Latin gangs?

20  **A.**  Yes.

21  **Q.**  And so tell me how that file is organized.  Tell me what it

22  looks like.  If we were to spread it out on the table here, if

23  you were to put it right here, can you just describe it for us

24  so we know what you are talking about.

25  **A.**  It's in a manila folder.

**Ferrando - Direct / Sabelli**

1  *Q.*  A metal folder -- manila, manila.  Okay.

2  *A.*  On the outside of the folder, it has Latin gang memos by

3  members.  And inside are the memos that are put in there,

4  copies made.

5  *Q.*  What kind of memos?

6  *A.*  Interdepartmental memos.

7  *Q.*  So give me an example of what an interdepartmental memo

8  might be.  Assume we are not San Francisco police officers.

9  You may know things -- you know a lot that we don't know, so

10  help us out.

11  *A.*  Okay.

12       *MS. WAGNER:*  Your Honor, we would object to this

13  being relevant.

14       The purpose of this evidentiary hearing was to find

15  out whether particular responsive documents exist within the

16  GTF.  This is going on into areas of official information that

17  is probably privileged, especially relative to the storage of

18  confidential informant files.  He is asking questions that

19  don't relate, necessarily, to this prosecution or defense.  And

20  I would note the department's objection.

21       *THE COURT:*  Well, some of that is true, but --

22       How much more do you have?

23       *MR. SABELLI:*  Your Honor, we are now talking

24  about -- I don't know.  I'm learning about this for the first

25  time.  I've been told repeatedly there is no MS13 file;

**Ferrando - Direct / Sabelli**

```
1   apparently, the lieutenant keeps a file.  We are now learning

2   about where it is and what is in it.  It might even include

3   debriefings of informants.  I can hardly think of anything that

4   would be more relevant.

5              THE COURT:  He didn't say there was an MS13 file.

6              MR. SABELLI:  A Latin gang file that contains MS13

7   documents.

8              THE COURT:  Well, all right.  So, all right,

9   continue.

10             The objection is overruled, I don't -- I haven't

11  heard anything yet that would be dangerous for the public to

12  know.  You think -- I mean, is there anything here that you are

13  saying that you think is dangerous to the public to know, how

14  you keep your records.

15             THE WITNESS:  He is asking what memo was --

16             THE COURT:  If you get to the point that you think

17  you are about to reveal something that would be dangerous to

18  get out in the public, then stop and we'll consider it.  But so

19  far, I think we are okay.

20             All right, continue on.  Objection is overruled.

21  BY MR. SABELLI:

22  Q.  If you could just tell us, generally, without revealing any

23  specific investigations or any specific names or whether they

24  are officers or individual targets, whatever, nothing specific,

25  tell us what kinds of interdepartmental memos would be in that
```

1  file.

2  **A.**  It would be documents written by officers, either the unit,

3  or -- it would come through our unit.  It could be written from

4  station to station, so if there is some correspondence --

5  that's why it's called interdepartmental -- if there is some

6  correspondence between a station and a station involving a gang

7  issue or problem, it would still get forwarded to our office.

8  So then that file would be filed at -- that memo would be filed

9  under Latin gangs.

10  **Q.**  Okay.  And to your knowledge, does that folder or envelope,

11  or whatever it is, contain any memoranda that describes MS13

12  in San Francisco?

13  **A.**  At the top of my head, I can't say right now.  There very

14  well could be.  You mean describes the gang, itself?

15  **Q.**  Yes.

16  **A.**  No.

17  **Q.**  Describes how MS13 operates or the investigation of MS13 in

18  San Francisco?

19  **A.**  As far as I know, no.  I haven't seen any memo come through

20  while I've been there, so I would say no at this time.

21  **Q.**  Okay.  And if such a memo existed, it would be in that

22  file, probably; is that fair to say?

23  **A.**  It could be.  If it came through our office, it would be in

24  there.

25  **Q.**  Okay.  And what about a gang validation memo, not the

**Ferrando - Direct / Sabelli**

1  validation of an individual gang member, but a memorandum that

2  validates the existence of a gang; to your knowledge, does that

3  exist with respect to MS13?

4  *A.* I don't recall one at this time.

5  *Q.* Do you know what I mean when I talk about a gang validation

6  memo?

7  *A.* Are talking about a memo that would validate the gang under

8  the parameters of 186.22?

9  *Q.* Correct.

10  *A.* I don't recall seeing one in that file.

11  *Q.* And if such a memo existed, it would be in the file that

12  you have just been talking about, in your office?

13  *A.* Not necessarily.

14  *Q.* Where would that be?

15  *A.* It could be in the alpha file or in the alpha file cabinet,

16  if it's a validation memo, that would explain that gang

17  validation.

18  *Q.* And so it might be within the alpha file cabinet within a

19  specific alpha file, or is there a different section within the

20  alpha file cabinet?

21  *A.* I don't know if there is a specific section for it, but if

22  the memo specifically says a name of a person involved in the

23  validation, it would be in his file.

24  *Q.* Okay.

25          Umm, any other place that we would look for if we

**Ferrando - Direct / Sabelli**

1    were trying to find a memorandum that described MS13 as it

2    exists in San Francisco?

3    **A.**  No.

4    **Q.**  Okay.

5            Where would information be stored about the lack of

6    credibility of informants related to MS13?

7    **A.**  The lack of credibility?

8            **MS. WAGNER:**  That assumes facts not in evidence.

9            **THE COURT:**  That's true.  It assumes that there is

10   lack of credibility.  And there is such -- hypothetically, if

11   there were such information, would you pay -- would you store

12   it?  And what would you do with it if you stored it?  Where

13   would it be?

14           **THE WITNESS:**  If there was lack of credibility of a

15   specific informant?

16   **BY MR. SABELLI:**

17   **Q.**  Yes, yes.

18   **A.**  I would store it in that informant's file.  If it's a lack

19   of credibility of the informant, then obviously, we are not

20   going to use him.

21           **THE COURT:**  This is in the paid informant file that

22   you mentioned?

23           **THE WITNESS:**  It would be in the paid informant

24   file.

25   **BY MR. SABELLI:**

**Ferrando - Direct / Sabelli**

1    *Q.*  If it's not a paid informant, where would it go?

2    *A.*  I haven't run across one in that manner yet.  But I

3    would -- I would definitely -- usually, if it was not a paid

4    informant, it was out in the open, informant that's -- you

5    know, I would definitely -- it would definitely be talked about

6    with the unit, for sure, and everybody would be debriefed on a

7    nonreliable informant, not to use him.

8    *Q.*  Okay.  And would that debriefing or that discussion that

9    you just referred to, would that be memorialized or reduced to

10   writing?

11   *A.*  Would that be what?  I'm sorry.

12   *Q.*  Would it be reduced to writing?  Would it be written down?

13   *A.*  It could be.

14   *Q.*  And if it was reduced to writing and written down, where

15   would that writing go?

16   *A.*  If it was writing, and it was about a specific gang member

17   that lacked credibility -- I guess that's where you're going?

18   *Q.*  Yes.

19   *A.*  It would definitely probably go in that gang member's file.

20   So if somebody was going to use that gang member for whatever

21   reason and he pulled his file, he would want to know everything

22   about him.  So it would go in his file.  That's where I would

23   put it.

24   *Q.*  Okay.

25            Are you familiar in this case with the fact that ICE

1   used at least two informants, 1218 and 1211?  Does that ring a

2   bell with you?  Are you familiar with that?

3   *A.*  I didn't have any specific knowledge of any informants used

4   in the ICE operation.

5   *Q.*  Okay.

6   *A.*  Security operation.

7   *Q.*  Fair to say you don't know whether or not a file was

8   maintained by GTF with respect to 1211 or 1218?

9   *A.*  And those are numbers given to Homeland Security

10  informants?

11  *Q.*  Correct.

12  *A.*  I would have no knowledge of that file.

13  *Q.*  Okay.  Let me -- let me switch to a different topic.

14          What is your understanding, as a lieutenant of the

15  Gang Task Force, as to how long files are maintained within the

16  Gang Task Force; that is to say, are files within the Gang Task

17  Force ever purged?  And if so, how and when are they purged?

18  *A.*  There is no definite timetable, if that's what you are

19  asking about.  Let's say we have a three- or a five-year

20  window.  We've never -- we've never established a window of

21  purging files, because a lot of people either do not have any

22  contact with law enforcement who are still active, so they may

23  not have developed an arrest record within a certain period of

24  time.  They could be incarcerated for five, seven, eight years,

25  and come back out and recommit crimes or still be part of the

**Ferrando - Direct / Sabelli**

1    gang.  So we don't have a specific time frame because

2    everything varies.  But if a person is deceased, we'll

3    definitely look at that file.  If we --

4    *Q.*  Definitely what?

5    *A.*  Deceased, passed away.

6    *Q.*  You said --

7    *A.*  We will review the file, because the file, although that

8    person has passed, the file still may contain records of other

9    gang members that he was involved with that we need to

10   redistribute to those files.  So he may not be active because

11   of not being around, but he may have stuff in his file that

12   needs to be redistributed.

13            Also, if we feel that a person is no longer a gang

14   member and has rehabilitated and is back into the community,

15   back into life, we'll review that file also.

16            What we've used as a criteria, a person gets out of

17   a gang the same way he gets into a gang.  It's very common with

18   the gang injunctions, that is what we use for that criteria.

19   If we feel the person is no longer a gang member, it's reviewed

20   by numerous -- the District Attorney's Office, the City

21   Attorney's Office, other people involved with that gang member,

22   people that have specific knowledge of that gang member.  It's

23   a review process that goes on.  And once we feel that that file

24   needs to be lifted, it will be.

25   *Q.*  Okay, so you will review a file to determine whether or not

**Ferrando - Direct / Sabelli**

1   it should be lifted, I think that's what you said.

2   **A.**  Taken out.

3   **Q.**  Lifted, meaning taken out of the Gang Task Force?

4   **A.**  Right.

5   **Q.**  So you've got an alpha file on somebody; you determine that

6   that person is no longer a gang member, he's clean or she's

7   clean, you lift the file, or take it out, it's gone?

8   **A.**  Lift, take out.

9   **Q.**  Take it out, that's what I mean.

10          Am I understanding you?

11  **A.**  That's correct.

12  **Q.**  Okay.

13          Now, when somebody is a gang member and becomes an

14  informant, a confidential reliable informant for the

15  San Francisco Police Department and they say they have left the

16  gang, is that person's file purged?

17  **A.**  Which file?

18  **Q.**  Lifted, this person's alpha file?

19  **A.**  That he has left the gang, he is no part of the gang

20  anymore --

21  **Q.**  He says I'm a CRI, I'm on your team, I'm on your team,

22  Lieutenant Ferrando, I'm not a member of MS13 anymore; you take

23  him at his word, I assume, because you are using him as an

24  informant.

25  **A.**  Okay.

**Ferrando - Direct / Sabelli**

1   **Q.**  Would you lift, as you say, that file?  Would you take out

2   that file?  And I'm referring to the alpha file.

3   **A.**  I would have to -- I can't -- with the information you are

4   giving me right now, I can't say that I would take that file

5   out just because he is a confidential reliable informant.

6   Because if he is a confidential reliable informant, he is still

7   interacting somewhere in there.  And I don't think, just with

8   what the information you are giving me, I would remove an alpha

9   file on that information.

10  **Q.**  Whose decision would it be to remove the alpha file?

11  **A.**  Like I say, we would review it with numerous different

12  bodies.  I mean, the District Attorney would also be involved,

13  there would be different people involved with removing the

14  file.

15          We have to reach out to people that have involvement

16  with that person or that gang or the crimes that he has

17  committed because those crimes are not unique to Gang Task

18  Force, we have homicides, sex crimes, general works, so we have

19  to make sure that we encompass everybody when we remove a file.

20  **Q.**  We are talking about the alpha file within the GTF, okay?

21  **A.**  Correct.

22  **Q.**  So within GTF, if an individual officer decides that

23  somebody has left the gang, can that officer lift the file by

24  himself or herself?

25  **A.**  Shouldn't, no.

**Ferrando - Direct / Sabelli**

1   *Q.*   Shouldn't?

2   *A.*   Shouldn't, correct.

3   *Q.*   Okay.

4           Are you aware of any times that that's occurred?

5   When I say "that," I mean that an officer has taken a file out

6   under the circumstances I've just described.

7   *A.*   I don't recall any.

8   *Q.*   How would you know about it if it happened?

9   *A.*   Like I say, if the person -- if the person was discussing

10  it amongst his team and took an alpha file out and removed it,

11  then it should move up the chain of command, it should be

12  discussed with other people involved in removing the file.

13  *Q.*   And where is the protocol written or established for doing

14  this?  You are describing a process that requires input from

15  more than one person, right?

16  *A.*   Right.

17  *Q.*   That is what you are saying?

18  *A.*   Right.

19  *Q.*   You are saying an officer generally isn't supposed to do it

20  by himself.

21  *A.*   Generally not, no.

22  *Q.*   Where is this process for purging a file, or "lifting" a

23  file, as you put it, where is this process described?

24  *A.*   I don't know of any written process.  I think it's just

25  basic law enforcement common sense.

**Ferrando - Direct / Sabelli**

1    **Q.**  So it's not written down anywhere, it's not communicated in

2    some sort of formal way, it's common sense?

3    **A.**  Well, exactly.  I don't know of any written general order,

4    information bulletin, training bulletin of taking a file.  It

5    requires expertise, like I said, other members of the

6    department, and what areas this gang member was involved in to

7    come together.

8    **Q.**  Okay.

9         During your time as lieutenant in the GTF, has any

10   officer come to you and said, I want to lift this file or I

11   want to purge this file of this gang member?

12   **A.**  Yes.

13   **Q.**  Okay.  About how many times?

14   **A.**  Umm, a few times.  I don't know the exact number.  A few

15   times, at least a few.

16   **Q.**  Were those individuals also informants?

17             **MS. WAGNER:**  Objection.  Compound.

18             **THE COURT:**  No, if you remember, you should answer

19   the question.  Please answer.

20             **THE WITNESS:**  Some may have been.

21   **BY MR. SABELLI:**

22   **Q.**  Did Sergeant Molina not ever purge a file, to your

23   knowledge, or lift a file?

24   **A.**  Not that I recall.

25   **Q.**  And if an officer believes that somebody is no longer a

**Ferrando - Direct / Sabelli**

1   member of a gang because this person is now an informant and

2   says, I'm no longer a member of a gang, and this officer takes

3   that file out of GTF, lifts it, how would you find out about

4   that?  Would you find out about that in the normal course of

5   your work?

6   **A.**   It depends on the -- on the -- on the realm of the file.

7   It depends who's involved with that person.  Does that make

8   sense?

9          Some people are very activity involved and have

10  tentacles spreading through different areas of the department

11  in different ways, be it injunction, be it different types of

12  crimes.  But if a person had minimal contact and it was just a

13  member -- if it's just GTF members that are involved in the

14  file, then that would be the only body that would need to

15  review it.  So that could occur.  It could be the team leader.

16  **Q.**   To your knowledge, is there any specific place within GTF

17  that notes or memoranda or reports about debriefing are stored?

18  **A.**   That's pretty -- you're asking something pretty wide.

19  **Q.**   Yeah.  I'm asking about debriefings; you understand the

20  debriefing of an informant?

21  **A.**   Oh, specific of informants?

22  **Q.**   Specific of an informant.  And I'm asking you, is there any

23  place within GTF that handwritten notes or notes of any kind or

24  memoranda or reports of those debriefings are kept, as in one

25  central repository?

**Ferrando - Direct / Sabelli**

1   *A.*   In GTF?

2   *Q.*   In GTF.

3   *A.*   Involving confidential informants?

4   *Q.*   Any kind.

5   *A.*   I'm not aware of any.

6          *MR. SABELLI:*  Thank you very much, Your Honor.

7          *THE COURT:*  All right.

8          Ms. Wagner?  Please use the lecturn.

9          *MS. WAGNER:*  I don't have any questions.

10         *THE COURT:*  All right.

11         May the witness be excused and discharged?

12         *MR. SABELLI:*  He may, Your Honor.

13         *THE COURT:*  All right.

14         Lieutenant, thank you.  You are free to go.

15         Any more witnesses?

16         *MR. SABELLI:*  No, Your Honor.  The Court directed us

17  to subpoena two witnesses, and we did so.

18         *THE COURT:*  All right.

19         Here is what I have a suggestion to do, see what you

20  all think about this:

21         This subpoena that you served I believe is largely

22  unenforceable as written because it was written at a time when

23  you didn't have the benefit of some of this information.  Some

24  of it might be -- what I would prefer to do, rather than deny

25  most of these, I could grant some of them, but we would spend

1   hours arguing over it, is say -- maybe not hours, but an hour

2   or so -- is to give you the opportunity to frame a new

3   subpoena, serve it, that is framed with the benefit of the

4   information you have gotten from this evidentiary hearing and

5   hopefully zero in on these things that you have -- that would

6   be specific.

7            **MR. SABELLI:**  That makes sense, Your Honor.

8            **THE COURT:**  If you would like to do that and then

9   serve it on Ms. Wagner, and you can bring me any issues that

10  need to be resolved.

11           **MR. SABELLI:**  That makes sense.

12           Ms. Wagner and I had met and conferred; we had

13  reached an agreement on many, if not most of the provisions.

14  But I think that in light of the testimony, it makes sense to

15  go back and take another look at what we asked for.

16           **THE COURT:**  All right, do you want to agree on when

17  you will serve your subpoena?

18           **MR. SABELLI:**  I would ask for ten days, Your Honor.

19           **THE COURT:**  Fine.  Ten days; will that land on a

20  weekend?  Probably it will.

21           **MR. SABELLI:**  The Monday after next, which I think

22  is -- the 28th is this Monday, so on October --

23           **THE COURT:**  It would be the 5th.

24           **MR. SABELLI:**  Thank you.

25           **THE COURT:**  And then Ms. Wagner, you want to respond

1    by the 19th?

2              **MS. WAGNER:**  Yes, Your Honor.

3              **THE COURT:**  Okay.

4              **MR. SABELLI:**  And, Your Honor, I have one

5    housekeeping matter that is semi-related to this.

6              **THE COURT:**  What's that?

7              **MR. SABELLI:**  During the first hearing on this

8    subpoena, the Court had asked Ms. Wagner to produce some alpha

9    files, and she has done so.

10             Thank you for doing that.

11             During the evidentiary hearing on the Brady motion,

12   I have asked for an MS13-related file that Sergeant McDonnell

13   had referred to, and Ms. Wagner also produced that to the

14   Court.  And the Court took a look at it and turned over to me

15   what the Court thought was appropriate.  I now have that.

16             I would like to be able to give copies of that to

17   other defense counsel because I believe it was ordered as part

18   of the Brady hearing.  The Court ordered me to do so as part of

19   its order, but I want to make sure that we are all on the same

20   page because the documents that were given to me came to me

21   through two different avenues.  One avenue I believe is only

22   appropriate for Mr. Herrera, and that is the alpha files that

23   have to do with Mr. Herrera --

24             **THE COURT:**  What was the other one that you want to

25   distribute?

1          **MR. SABELLI:**  It's the MS13 file that Sergeant

2     McDonnell referred to during his testimony on August 4th.  And

3     when the Court released that to me in its order, it said if

4     other counsel asks for copies, Mr. Sabelli, you can give them

5     copies.  And I just want to make sure we are all on the same

6     page.

7          **THE COURT:**  All right.

8          Is that all right, Ms. Wagner?

9          **MS. WAGNER:**  Well, I guess the department would ask

10    for a clear articulation of who has joined in each particular

11    defendant's pleadings because I don't think that is clear.

12         **MR. SABELLI:**  If the Court wishes, I can distribute

13    it only to the people who joined the Brady motion.  I don't

14    want to give it to somebody who is not entitled to it.  Since

15    the Court has put it in my hands, I'm happy to do so.  I just

16    want to know what the Court --

17         **THE COURT:**  Was there secret information in there?

18    Is there a protective order on this, for example?  I don't

19    remember that.

20         **MR. SABELLI:**  Ms. Wagner and I entered into a

21    protective order that I believe covers the information that she

22    has turned over.

23         **THE COURT:**  All right.

24         **MR. SABELLI:**  Is that fair, Ms. Wagner?

25         **MS. WAGNER:**  I agree with that, yes, Your Honor.

1          **THE COURT:**  Well, you tell me; is there information

2    in there that would be of general use in defending against this

3    case?

4          **MR. SABELLI:**  In my opinion, yes, Your Honor.

5          **THE COURT:**  For all defendants, I mean.

6          **MR. SABELLI:**  In my opinion, yes.

7          **THE COURT:**  All right, well, then, you can do the

8    following:  If someone agrees in writing and says that they

9    will join in to your protective order, is that even in writing?

10         **MR. SABELLI:**  It is, Your Honor.

11         **THE COURT:**  All right.  They will sign onto the

12   protective order, and to the same extent that you have, and you

13   can turn over that one file on MS13 to that defendant.

14         **MR. SABELLI:**  We'll circulate it, and we'll file it

15   with the Court.

16         The Court has approved the protective order that

17   Ms. Wagner and I agreed upon.  The Court signed it and filed,

18   so we'll do the same with respect to the other defendants.

19         **THE COURT:**  Ms. Wagner, seems to me that that is

20   reasonable.  The other people could subpoena the same

21   information, so this will save you some steps.

22         **MS. WAGNER:**  Agreed, Your Honor, as long as these

23   recipients do join and execute the protective order.

24         **THE COURT:**  Anything more for today?

25         **MR. SABELLI:**  No, Your Honor.  Thank you.

1          **MS. WAGNER:**  Thanks, Judge.

2          **THE COURT:**  All right.

3                    **(Proceedings adjourned at 3:04 p.m.)**

4

5

6                         **---o0o---**

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE OF REPORTER

I, Sahar McVickar, Official Court Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings were reported by me, a certified shorthand reporter, and were thereafter transcribed under my direction into typewriting; that the foregoing is a full, complete and true record of said proceedings as bound by me at the time of filing.  The validity of the reporter's certification of said transcript may be void upon disassembly and/or removal from the court file.

/s/ Sahar McVickar
_____

Sahar McVickar, RPR, CSR No. 12963

Wednesday, September 30, 2009