1 | MELINDA HAAG (CABN 132612)
United States Attorney

2 | MIRANDA KANE (CABN 150630)
Chief, Criminal Division

3 | W.S. WILSON LEUNG (CABN 190939)
WIL FRENTZEN (LABN 24421)
CHRISTINE Y. WONG (NYBN 3988607)
Assistant United States Attorneys

450 Golden Gate Avenue, Box 36055
San Francisco, California 94102
Telephone: (415) 436-6758
Facsimile: (415) 436-6753
E-Mail: wilson.leung@usdoj.gov

THERYN GIBBONS (NYBN 759321)
Trial Attorney, United States Department of Justice

Attorneys for the United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No: S3-CR-08-0730 WHA |
| v. | GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS INDICTMENT FOR OUTRAGEOUS GOVERNMENT CONDUCT |
| GUILLERMO HERRERA, | |
| Defendant. | Hearing: February 14, 2011<br>Time: 8:00 a.m.<br>Court: Hon. William Alsup |

**TABLE OF CONTENTS**

I. Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II. Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III. Discussion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A. Herrera's Motion Is Untimely. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    B. Herrera's Motion Is Frivolous. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        1.    Applicable Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    C. The Court Should Reject The Defendant's Demand For An Evidentiary Hearing. . . . . 12

IV. Conclusion.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Bank of Nova Scotia v. United States*, 487 U.S. 250 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Stolt-Nielsen, S.A. v. United States*, 442 F.3d 177 (3rd Cir. 2006). . . . . . . . . . . . . . . . . . . . . . 10

*United States v. Ahluwalia*, 30 F.3d 1143 (9th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*United States v. Armstrong*, 517 U.S. 456 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States v. Bonanno*, 852 F.2d 434 (9th Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

*United States v. Cox*, 342 F.2d 167 (5th Cir. 1965). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*United States v. Emmert*, 829 F.2d 805 (9th Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*United States v. Fernandez*, 388 F.3d 1199 (9th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

*United States v. Fortna*, 796 F.2d 724 (5th Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Gurolla*, 333 F.3d 944 (9th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

*United States v. Holler*, 411 F.3d 1061 (9th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 12

*United States v. Lopez*, 4 F.3d 1455 (9th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Navarro-Vargas*, 408 F.3d 1184 (9th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . 11

*United States v. Nixon*, 418 U.S. 683 (1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States v. Ross*, 372 F.3d 1097 (9th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Smith*, 924 F.2d 889 (9th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*United States v. Solorio*, 37 F.3d 454 (9th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Solorio*, 53 F.3d 341 (9th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Williams*, 547 F.3d 1187 (9th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Wayte v. United States*, 470 U.S. 598 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

## FEDERAL RULES, STATUTES, AND GUIDELINES

18 U.S.C. § 924. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 1546. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

18 U.S.C. §1959. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 1962. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 3500. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

## I.   Introduction

The Government respectfully submits this opposition to the defendant Guillermo Herrera's motion to dismiss the Indictment based on his claim of outrageous Government conduct (Docket #3136 ).  The Government also requests that this opposition be deemed responsive to any other defendants who are allowed to join in Herrera's motion.  For the reasons set forth below, Herrera's motion to dismiss should be dismissed as untimely or denied on the merits without a hearing.

## II.   Background

Defendant Guillermo Herrera is presently charged in the above-captioned Third Superseding Indictment with: (1) racketeering conspiracy, in violation of 18 U.S.C. § 1962(d) (Count One); (2) conspiracy to commit murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(5) (Count Two); (3) conspiracy to commit assault with a dangerous weapon in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(6) (Count Three); (4) murder in aid of racketeering, in violation of 18 U.S.C. §§ 1959(a)(1) and 2 (Count Thirteen); (5) using/possessing a firearm in furtherance of a crime of violence resulting in murder, in violation of 18 U.S.C. §§ 924(j) and 2 (Count Fourteen); and (6) using/possessing a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. §§ 924(c) and 2 (Count Fifteen).

Herrera's arrest was part of a long-term federal[1] investigation into crimes committed by members of the transnational gang *La Mara Salvatrucha* (also known as "MS-13") in the San Francisco Bay Area.  The original racketeering indictment in this case was unsealed on the day of the take-down, October 22, 2008, and charged twenty-nine individuals with a variety of crimes,

---

[1] The defendant erroneously suggests that the underlying investigation was some sort of a joint federal and state investigation.  See Def. Motion at 3.  This assertion is incorrect.  As the Court found after three days of evidentiary hearings in 2009, although there was coordination between federal and state and law enforcement officers, the underlying investigation was a federal investigation.  Moreover, the underlying investigation was an investigation by Immigration and Customs Enforcement and did not involve the Federal Bureau of Investigation.  See Leung Dec. ¶ 2.

including racketeering conspiracy.[2] The presently pending Third Superseding Indictment, returned on September 24, 2009, similarly charges twenty-nine defendants with a variety of offenses, including twenty-four with racketeering-related crimes. Among the crimes now charged are six racketeering-related murders, five of which occurred in San Francisco in 2008, and one of which occurred in Daly City on February 19, 2009. Herrera himself is charged with one of the five San Francisco murders, i.e., the July 11, 2008, shotgun murder of Armando Estrada on 20th and Mission Streets.

Three 2008 murders, however, were not charged in this case: the June 22, 2008 murders of Anthony Bologna and his sons Michael and Matthew, who were killed in the Excelsior District of San Francisco as they drove home together. MS-13 member Edwin Ramos has been charged with these murders, and his murder case is pending in San Francisco Superior Court. See, e.g., http://www.ktvu.com/news/16701510/detail.html. The murders of Anthony, Michael, and Matthew Bologna are the basis of the defendant's present motion.

**III.   Discussion**

Herrera contends that the Government intentionally chose not to arrest or deport Edwin Ramos because it wanted to generate publicity by charging a large number of defendants in one highly-publicized "mega-case." The defendant claims that the Government's alleged inaction against Ramos somehow violated his own right to due process and seeks dismissal of the Indictment. The defendant also contends that the Court should dismiss the Indictment based on its "supervisory power." As an alternative to dismissal, the defendant demands an evidentiary hearing relating to the Government's alleged "delay" in arresting Edwin Ramos, the Government's alleged provision of funds to Informant 1218 to use to buy firearms to kill members of rival gangs, the alleged "leadership" of 1218 and Informant 1211 within the gang, and 1211's alleged recruitment of young gang members and "fomentation of violence."

---

[2] Herrera was originally taken into federal custody on or about September 8, 2008, when, after a state murder charge was dismissed against him, he was arrested for possession of a fraudulent Permanent Resident Alien Card, in violation of 18 U.S.C. § 1546. Herrera was indicted for this charge, and, at the request of the defendant, Judge Illston is allowing this case to trail the present racketeering case. See 08-CR-00674-SI.

For the following reasons, Herrera's motion is both untimely as well as devoid of merit, and should be dismissed and/or denied.

### A. Herrera's Motion Is Untimely

As an initial matter, the defendant's motion to dismiss the Indictment should itself be dismissed as untimely. As the Court is aware, February 22, 2010, was the deadline for the defendants to bring any motions to dismiss the Indictment. Any motions to dismiss were filed and litigated long ago. Indeed, defendant Manuel Franco filed his own motion to dismiss based on a claim of outrageous government conduct six days before Herrera filed his motion, and the Court denied Franco's motion as untimely. See Jan. 27, 2011 Order (Docket #3161).

After the Court denied Franco's motion, Herrera sought to justify his own failure to file his present motion earlier, filing no fewer than three submissions to explain his eleven-month delay. See Jan. 27, 2011 Sabelli Dec.(Docket #3165); Jan. 28, 2011 Def. Memo in Support of Timeliness (Docket #3189); and Feb. 2, 2011 Sabelli Dec. (Docket #3267). Because the murder of the Bolognas on which the defendant relies occurred on June 22, 2008, more than four months prior to the take-down in this case, the defendant's only excuse for the lateness of his present motion is his claim that it is based on information only recently provided by the Government. Indeed, in his sworn declaration of February 2, 2011, addressing the timeliness of the motion, Martin Sabelli, Esq., counsel for Herrera, asserted that "[m]ost of the information detailed below was produced after December 22, 2010 — approximately ten months after the deadline for filing motions to dismiss based upon the face of the indictment." Feb. 2, 2011 Sabelli Dec. (Docket # 3267) ¶ 5. This assertion, however, is demonstrably false.

According to the Government's records, almost all the items cited by Mr. Sabelli in his February 2, 2011 declaration were provided to the defense well before December 22, 2010. Indeed, most of the information on which the defendant's motion relies was provided to the defense at least a full year before the February 22, 2010, deadline for motions to dismiss. Every reference that the Sabelli Declaration of February 2, 2011, made to specific discovery items is addressed below. More specifically:

-4-

1. Paragraphs 9 and 21 of the Sabelli Declaration of February 2, 2011, purportedly[3] rely on ROI 046 for the proposition that 1218 was recruited as an informant in or about October 2005. ROI 046 was provided to the defense on January 5, 2011, and begins with control number "UNREDACTED ROI-000130."

2. Paragraphs 10 through 15 of the Sabelli Declaration purportedly rely on ROI 280. ROI 280 was provided to the defense on December 8, 2008, and begins with control number "R0654."

3. Paragraph 16 of the Sabelli Declaration purportedly relies on ROI 313. ROI 313 was provided to the defense on December 8, 2008, and begins with control number "R0738."

4. Paragraph 17 of the Sabelli Declaration purportedly relies on ROI 329. ROI 329 was provided to the defense on December 8, 2008, and begins with control number "R0764."

5. Paragraph 22 of the Sabelli Declaration purportedly relies on an FBI report bearing control number "R001155." This report was provided to the defense on February 12, 2009.

6. Paragraph 23 of the Sabelli Declaration purportedly relies on an FBI report bearing control number "R001165." This report was provided to the defense on February 12, 2009.

7. Paragraph 24 of the Sabelli Declaration purportedly relies on ROIs 004 and 005, as well as on an FBI report bearing control number "R001140." ROIs 004 and 005 were provided to the defense on December 8, 2008, and begin with control numbers "R0004" and "R0007," respectively. R001140, in turn, was provided to the defense on February 12, 2009.

8. Footnote 2 in paragraph 25 of the Sabelli Declaration purportedly relies on an FBI report bearing control number "R001194." This report was provided to the defense on February 12, 2009.

9. Paragraph 26 of the Sabelli Declaration purportedly relies on an FBI report bearing control number "R001206." This report was provided to the defense on February 12, 2009.

10. Paragraph 27 of the Sabelli Declaration purportedly relies on an FBI report bearing control number "R001222." This report was provided to the defense on February 12, 2009.

11. Paragraph 28 of the Sabelli Declaration purportedly relies on an FBI report bearing control number "R001221." This report was provided to the defense on February 12, 2009.

12. Paragraph 29 of the Sabelli Declaration purportedly relies on an FBI report bearing control number "MF00084." This report was provided only to counsel for one of

---

[3] The accuracy of the defendant's descriptions of the contents of the referenced materials is debatable. However, because the defendant's motion to dismiss is both untimely and meritless as a matter of law, the accuracy of the defendant's descriptions of the contents of the referenced material will not be addressed herein.

Herrera's co-defendants on December 17, 2009. However, a virtually identical report — that is, a report containing the same information but with a slight pagination difference — was produced to Herrera on July 23, 2010, and bears control number "CI1218-00191."

13. Paragraph 30 of the Sabelli Declaration purportedly relies on an FBI report bearing control number "CG-000139." This report was provided to the defense on January 14, 2011. However, a virtually identical report — that is, a report containing the same information but with a slight pagination difference — was previously produced to Herrera on July 23, 2010, and bears control number "CI1218-00206."

14. Paragraph 31 of the Sabelli Declaration purportedly relies on an FBI report bearing control number "R001230." This report was provided to the defense on February 12, 2009.

15. Paragraph 32 of the Sabelli Declaration purportedly relies on an FBI report bearing control number "R001235." This report was provided to the defense on February 12, 2009.

16. Paragraph 33 of the Sabelli Declaration purportedly relies on an FBI report bearing control number "R001243." This report was provided to the defense on February 12, 2009.

17. Paragraph 34 of the Sabelli Declaration purportedly relies on an FBI report bearing control number "R001140." As noted above, this report was provided to the defense on February 12, 2009.

18. Paragraph 36 of the Sabelli Declaration purportedly relies on an FBI report bearing control number "R001155."[4] This report was provided to the defense on February 12, 2009.

19. Paragraphs 37 and 38 of the Sabelli Declaration purportedly rely on ROIs 005 and 009. These ROIs were provided to the defense on December 8, 2008, and begin with control numbers "R0007" and "R0016," respectively.

20. Paragraph 39 of the Sabelli Declaration purportedly relies on ROI 015. This ROI was provided to the defense on December 8, 2008, and begins with control number "R00033."

21. Paragraph 40 of the Sabelli Declaration purportedly relies on ROI 040. This ROI was provided to the defense on December 8, 2008, and begins with control number "R0101."

22. Paragraph 44 of the Sabelli Declaration purportedly relies on ROI 037. This ROI was provided to the defense on December 8, 2008, and begins with control number "R0094."

23. Paragraph 45 of the Sabelli Declaration purportedly relies on ROI 048. This ROI was provided to the defense on December 8, 2008, and begins with control number

---

[4] As an example of the defendant's mischaracterization of the contents of the reports, R001155 contains no reference at all to 1211. Thus, paragraph 36 as a whole is misleading because it suggests that R001155 states that 1211 somehow threatened to green-light the entire 20th Street Clique.

"R00115."

24.   Paragraph 46 of the Sabelli Declaration purportedly relies on ROI 052. This ROI was provided to the defense on December 8, 2008, and begins with control number "R0125."

25.   Paragraphs 41-43 of the Sabelli Declaration purportedly rely on the transcript of a recording, DH006. Although the final transcript was not produced until Jan. 18, 2011, the underlying recording was produced long before, no later than March 15, 2009. In addition, the Government provided a draft transcript of DH006 (bearing control numbers "T014629" to "T014713") no later than on or about October 22, 2010 that is substantially similar to the final transcript for DH006.

See Leung Dec. ¶ 3.

Thus, virtually all of the materials referenced in Mr. Sabelli's February 22, 2011 Declaration were not produced *after* December 22, 2010, but rather, much earlier, mostly on December 8, 2008, and February 12, 2009. ROI 046 is the only item referenced in Mr. Sabelli's February 22, 2011 Declaration that was produced entirely after December 22, 2010, and the defendant relies on ROI 046 only for the non-controversial and already-disclosed fact that ICE recruited 1218 in or about October 2005. The defendant's claim that his present motion to dismiss could not have been brought earlier because it is "mostly" based on information disclosed after December 22, 2010, is contradicted by the truth.

In any event, the defendant was certainly aware of the bases of his present motion long ago. The murder of the Bolognas occurred four months before the unsealing of the original indictment in this case, and, according to the news articles cited by the defendant, the controversy regarding the failure to deport or arrest Edwin Ramos prior to the murders also arose well before this case. See, e.g., Jan. 26, 2011 Sabelli Dec. 2011 (Docket #3136) ¶ 15 (referencing article dated July 16, 2008). Moreover, from the very beginning of this case, the defendant has been accusing 1218 and 1211 of engineering the crimes that have been charged. Thus, there is absolutely nothing new that would justify the defendant's late filing of his motion to dismiss. Accordingly, as with Manuel Franco's recent motion to dismiss based on outrageous government conduct, the defendant's motion should also be dismissed as untimely.[5]

---

[5] Mr. Sabelli's Declaration of February 2, 2011, also blames the untimeliness of the defendant's present motion to, inter alia, the Government's "incomplete" Jencks production. See Docket #3267 ¶ 3. The Jencks Act, however, does not require the production of witness statements until *after* the witness has testified on direct examination. See 18 U.S.C. § 3500.

**B.     Herrera's Motion Is Frivolous**

Even if the Court were to excuse Herrera's untimely filing of his motion to dismiss, the motion would still fail on its merits.

*1.     Applicable Law*

Dismissal of an indictment based on a claim of outrageous government conduct can be based on either the due process clause or on the Court's own supervisory powers.

"Outrageous government conduct is not a defense, but rather a claim that government conduct in securing an indictment was so shocking to due process values that the indictment must be dismissed. To meet this high standard, the governmental conduct must be so grossly shocking and so outrageous as to violate the universal sense of justice." United States v. Holler, 411 F.3d 1061, 1065-66 (9th Cir. 2005) (internal quotation marks and citations omitted); see United States v. Williams, 547 F.3d 1187, 1199 (9th Cir. 2008); United States v. Smith, 924 F.2d 889 (9th Cir. 1991).

To constitute a violation of due process, the Government's involvement in the charged activity "must be *malum in se* or amount to the engineering and direction of the criminal enterprise from start to finish," United States v. Ahluwalia, 30 F.3d 1143, 1144 (9th Cir. 1994) (internal quotation marks and citation omitted), or be in "that slim category of cases in which the police have been brutal, employing physical or psychological coercion against the defendant," United States v. Fernandez, 388 F.3d 1199, 1238 (9th Cir. 2004) (internal quotation marks and citation omitted). As the Ninth Circuit has explained, "a defendant must meet an extremely high standard." Williams, 547 F.3d at 1199. Thus, in United States v. Bonanno, 852 F.2d 434 (9th Cir. 1988), the Ninth Circuit set forth five factors that precludes a claim of outrageous government conduct:

> (1) the defendant was already involved in a continuing series of similar crimes, or the charged criminal enterprise was already in process at the time the government agent became involved; (2) the agent's participation was not necessary to enable the defendants to continue the criminal activity; (3) the agent used artifice and strategem to ferret out criminal activity; (4) the agent infiltrated a criminal

---

Thus, Mr. Sabelli's assertion that the Government was somehow delinquent in its Jencks production on January 26, 2011 — more than a month before trial — rests on an inaccurate premise.

organization; and (5) the agent approached persons already contemplating or engaged in criminal activity.

Id. at 437-38.

Alternatively, "[t]o justify the exercise of the court's supervisory powers . . . , prosecutorial misconduct must '(1) be flagrant and (2) cause "substantial prejudice" to the defendant.'" Fernandez, 388 F.3d at 1239 (quoting United States v. Ross, 372 F.3d 1097, 1110 (9th Cir. 2004)). The Ninth Circuit has emphasized that a defendant seeking dismissal must establish prejudice:

> A district court may not use its supervisory authority to dismiss an indictment for prosecutorial misconduct "not prejudicial to the defendant." [Bank of Nova Scotia v. United States, 487 U.S. 250, 255 (1988)] The supervisory authority may only dismiss an indictment in response to prejudicial conduct because "[e]ven a sensible and efficient use of the supervisory power . . . is invalid if it conflicts with constitutional or statutory provisions," including the harmless error rule prescribed by Federal Rule of Criminal Procedure 52(a). Id. at 254. Where the defendant asks the district court to use its supervisory powers to dismiss an indictment for outrageous government conduct, the proper prejudice inquiry is whether the government conduct "had at least some impact on the verdict and thus redounded to [the defendant's] prejudice." United States v. Lopez, 4 F.3d 1455, 1464 (9th Cir. 1993) (alteration in original) [citing Bank of Nova Scotia, 487 U.S. at 263] ("The prejudicial inquiry must focus on whether any violations had an effect on the grand jury's decision to indict.").

Ross, 372 F.3d at 1110 (second alteration in original, additional citations omitted).

   *2.   Discussion*

Herrera's motion to dismiss is unclear. He seems to invoke only the Court's supervisory powers, but then conflates this invocation with constitutional limitations:

> This Court should dismiss the indictment under its supervisory power and outline constitutional limitations in cases where (1) the government has probable cause to arrest and charge defendants with violent offenses or to deport them; (2) the government knows that those same defendants are engaging in an on-going pattern of serious violent acts; and (3) instead of arresting and charging or deporting those persons singly or in small groups, the government engages in a deliberate strategy of delay in order to charge a large number of those defendants in one highly publicized mega-case.

Def. Motion at 2-3.

Regardless of his actual claim, however, the defendant's motion to dismiss is utterly without merit under either due process or supervisory powers analysis. The defendant's claim that the Government intentionally delayed either arresting or deporting Edwin Ramos in order to

conduct what he calls a "highly publicized mega-case" is without any factual support.[6] The Government will not, however, comment on its charging decisions, even in response to the defendant's baseless allegations. In any event, the defendant's claim of outrageous government fails as a matter of law.

In essence, the defendant's claim is based on the Government's charging decision — or rather, its decision not to take action — with respect to Edwin Ramos. Dismissing an indictment based on the Government's failure to charge a third-party, however, would be a clear violation of the separation of powers. "The Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case." United States v. Nixon, 418 U.S. 683, 693 (1974); United States v. Armstrong, 517 U.S. 456, 464-65 (1996) ("United States Attorneys retain 'broad discretion' to enforce the Nation's criminal laws."). This discretion is based on the recognition that the executive branch is more capable than the courts in weighing factors such as "the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan," and that subjecting its decisions to outside inquiry could significantly "undermine prosecutorial effectiveness." Armstrong, 517 U.S. at 465 (citing Wayte v. United States, 470 U.S. 598, 607 (1985)); see, e.g., Stolt-Nielsen, S.A. v. United States, 442 F.3d 177, 178, 187 (3rd Cir. 2006) (holding that district court lacked jurisdiction to enjoin federal government from prosecuting corporation for antitrust violations after Government decided that corporation violated terms of cooperation agreement).

The general deference afforded to the executive branch in its charging decisions — which can only be reviewed for extreme abuses, such as selective prosecution and true violations of due process — is even greater for decisions *not to charge*. As the Ninth Circuit has explained,

---

[6] Indeed, the defendant fails to realize that he himself was arrested on lesser charges prior to being indicted in the present case. The Government also arrested other defendants in this case on lesser charges prior to charging them in the pending racketeering case, e.g., Erick Lopez, who was charged with being an illegal alien in possession of a firearm on May 22, 2008, see 08 CR-00342-SI, and Jonathan Cruz-Ramirez, who was arrested for illegal re-entry on July 28, 2008, and then charged with illegal re-entry and being an illegal alien in possession of a firearm on August 7, 2008, see 08-CR-00531-JSW.

> Notwithstanding Article II's instruction to take care that the laws are faithfully executed, the president and those who represent him have broad independence in their prosecutorial decisions.  The president's independence arises not out of any constitutional direction to exercise prosecutorial discretion, prosecutorial nullification, or substantive constitutional review, but out of the lack of any check on the president's ability to do so.  *The president operates virtually without check on decisions not to charge violations*.

United States v. Navarro-Vargas, 408 F.3d 1184, 1206 (9th Cir. 2005) (emphasis added); see United States v. Cox, 342 F.2d 167, 172 (5th Cir. 1965) (reversing district court's contempt order against Department of Justice officials for refusing to file indictments sought by a grand jury); see also United States v. Gurolla, 333 F.3d 944, 950 (9th Cir. 2003) (rejecting claim of outrageous government conduct based on a claim of a violation of treaty with Mexico and explaining, "[a]s a general rule, courts do not have the authority to supervise out-of-court executive procedure in the absence of a constitutional or statutory violation") (internal quotation marks and citation omitted).

Here, the defendant would have the Court determine after the fact whether the Government should have taken executive action against Edwin Ramos.  This is clearly beyond the proper bounds of the judiciary's role and a violation of the separation of powers.  Accordingly, the defendant's claim fails.

In addition, the defendant fails to establish any government misconduct, let alone conduct "so grossly shocking and so outrageous as to violate the universal sense of justice."  The Government has found no case in which a claim of government misconduct — let alone a successful claim of government misconduct — was based on the government's alleged failure to act.  Unlike the claimants in every other case involving a claim of government misconduct, the defendant has not alleged any wrongs done to him.  Rather, he seeks to exploit the murders of Anthony, Michael, and Matthew Bologna for his own benefit.  Yet, aside from his general claim of vindicating the safety of the public, the defendant's motion utterly fails to explain how these murders affected his own due process rights or caused him any prejudice whatsoever.  See Gurolla 333 F.3d at 950 (rejecting claim of outrageous government conduct based on a claim of a violation of treaty with Mexico because, among other things, the appellant lacked "standing to enforce the treaty"); see also United States v. Emmert, 829 F.2d 805, 808-09 (9th Cir. 1987)

(rejecting "derivative entrapment" claim and holding that entrapment defense is only available to defendants who were directly induced by government agents"); United States v. Fortna, 796 F.2d 724, 732 (5th Cir. 1986) (holding that Fifth Amendment rights, like Fourth Amendment rights, "are personal in nature and cannot be asserted vicariously").[7] Thus, under both due process and supervisory powers analysis, the defendant's motion utterly fails.

The defendant's claim of outrageous government conduct is completely without merit and should be rejected.

### C. The Court Should Reject The Defendant's Demand For An Evidentiary Hearing

Finally, the defendant's demand for an evidentiary hearing should be denied. For the reasons set forth above, his principal claim based on the lack of executive action against Edwin Ramos is simply not subject to judicial review. In addition, his general allegations relating to 1218 and 1211 are nothing new and predicated on no concrete facts. In particular, the defendant has failed to provide any supported allegation that the Government's use of 1218 and 1211 somehow constituted a violation of his own rights. Cf. Holler, 411 F.3d at 1066 ("It is unrealistic to expect law enforcement officers to ferret out criminals without the help of unsavory characters.") (internal quotation marks and citation omitted); Gurolla, 333 F.3d at 950 (denying motion to dismiss based on a claim of outrageous government conduct and explaining that the "standard is not met when the government merely infiltrates an existing organization, approaches persons it believes to be already engaged in or planning to participate in the conspiracy, or provides valuable and necessary items to the venture").

Rather than seeking yet another fishing expedition in order to try to preview the case against him, the defendant should simply try his case. His demand for an evidentiary hearing is merely a concession that his motion to dismiss is frivolous, and should be denied.

---

[7] The Ninth Circuit in United States v. Solorio, 37 F.3d 454, 456, 462 (9th Cir. 1994), specifically reversed one defendant's conviction based on outrageous government conduct but rejected the co-defendant's identical claim because the co-defendant lacked "standing" to raise the claim because the misconduct was directed against the other defendant. This opinion, however, was subsequently withdrawn by the court and the conviction was later affirmed via an unpublished opinion. See 53 F.3d 341 (9th Cir. 1995).

### IV. Conclusion

For all of the reasons set forth above, Herrera's motion to dismiss should itself be dismissed as untimely or denied on the merits. The defendant's claim that his motion is based mostly on information provided to him after December 22, 2010, is demonstrably false. In any event, the defendant's attempt to exploit the brutal murders of Anthony, Michael, and Matthew Bologna should be rejected. As a matter of law, the defendant's motion seeks to lead the Court into violating the separation of powers. Under clearly established case law, the defendant has failed to articulate a non-frivolous basis on which he can claim government misconduct directed at him in violation of his own rights. He would have the Court dismiss charges against one murderer — himself — just because the Government allegedly failed to pre-empt another murderer, Edwin Ramos. Furthermore, the defendant's demand for an evidentiary hearing should be denied because he has failed to allege how 1218 and 1211 are relevant at all to his claim. Rather than serving any necessary fact-finding purpose, defendant's requested hearing is simply another fishing expedition that will serve no purpose other than to waste the resources of the Court and the Government on the eve of trial.

DATED: February 7, 2011

                              Respectfully submitted,

                              MELINDA HAAG
                              United States Attorney

By:    /s/
       W.S. Wilson Leung
       Wil Frentzen
       Christine Y. Wong
       Assistant United States Attorneys

       Theryn G. Gibbons
       Trial Attorney, United States Department of Justice